## CALDWELL v. ROBINSON.

### (Circuit Court, D. Idaho, C. D. January 22, 1894.)

1. **PUBLIC LANDS—INDIAN COUNTRY—SETTLEMENTS—INTERCOURSE LAWS.**

   The provision in the intercourse act of 1834, (4 Stat. 729, § 11,) forbidding white persons from settling upon any lands "belonging, secured, or granted by treaty" to any Indian tribe, did not prohibit settlement upon lands in the Indian country outside of any reservation, and in which the only Indian right was the original right of occupancy at the will of the government.

2. **SAME—OREGON LANDS—RIGHTS ACQUIRED UNDER PROVISIONAL GOVERNMENT.**

   By the provisions of sections 4 and 7 of the Oregon donation act, passed in 1850, all rights to land which accrued under the previous provisional government of Oregon were recognized, but the grant was finally to pass to the settler only by a compliance with the conditions prescribed by the act.

3. **SAME—DONATION ACT—REGION COVERED.**

   The provisions of the donation act recognizing claims arising under the provisional government were not limited to lands lying west of the Cascade mountains, but extended to the whole territory as then existing. The provisions for surveys and disposal of public lands were at first so limited, but were afterwards extended to lands east of such mountains. 11 Stat. 293.

4. **SAME—INDIAN RESERVATION—VESTED RIGHTS—CONSTITUTIONAL LAW.**

   A settler who acquired rights under the provisional government, and afterwards complied with the conditions of the donation act, in so far as he was not forestalled by the land officers, but who was refused a certificate and patent, acquired a vested right which congress could not afterwards treat as a mere right of occupancy; and, although the land was subsequently included in an Indian reservation, the government officials could not disturb the possession of his grantees.

5. **SAME—COURTS—ENJOINING PUBLIC OFFICERS.**

   The officers or agents of the interior department may be enjoined from unlawfully ejecting a person having a vested right to the possession of lands.

In Equity. Suit originally brought in a state court by William A. Caldwell to enjoin Joseph Robinson, an Indian agent of the United States, from forcibly ejecting him from the possession of certain lands in the Nez Perce Indian reservation. On motion to dissolve an injunction granted by the state court. Denied.

James W. Reid, for complainant.

Fremont Wood, U. S. Atty., for defendant.

BEATTY, District Judge. This cause was removed from the state court, wherein an order had been made enjoining defendant from ejecting the complainant from certain lands. The motion for dissolution of such order being called, the parties, stipulating to submit the cause upon its merits, agreed to a statement of facts, among which are:

That William Craig, a citizen of the United States, with his wife, an Indian woman, in the year of 1846, settled upon the tract of land in controversy, containing 640 acres, situated within the Nez Perce Indian reservation in the state of Idaho, but at the time of settlement within what was Oregon territory; that they resided upon and cultivated said land from such settlement until 1869; that on June

4, 1855, said Craig filed in the proper land office the notice of his claim to such land, and a description thereof, under the act of September 27, 1850, (9 Stat. 496,) commonly known as the "Oregon Donation Act," and at the same time made and filed in said land office his proof of residence upon and cultivation of such land for four years; that by mesne conveyance complainant is now in the possession of and claims to own the undivided one-half of the land, the legal title being still in the government; that defendant is the Indian agent in charge of such reservation, and that only as such, and under instructions from his superior officers of the interior department, his actions in this matter were taken.

1. The defendant claims that Craig's settlement was void, because at the time made the "Indian title" to the land had not been extinguished. That title was only such as attached to the unsettled and unoccupied public domain which had not been designated by congress for some special purpose, for, so far as appears, the land in question had not been so designated prior to such settlement.

It is unnecessary to now indulge in any reflections upon the systems of ethics which governed the Christian world in the acquisition of this country. Our aggressions upon the rights of the native race may continue to be, as they have been, a subject for pathetic song, and for the casuist's pen, but not one for present consideration. It has long been settled that the Indians had no title to this continent which we felt bound to consider during the process of its acquisition. When the Christian princes of Europe commissioned their subjects upon voyages of discovery, it was not doubted that all lands found by them in the possession only of the heathen could lawfully be taken by the discoverer, and from then until now the Indian heritage has been transferred from one government to another, and to their subjects, in total disregard of any claim or title thereto by the natives. From the Mississippi river to the "South Sea" the country was claimed under an absolute title by the governments of France and Spain. Their title passed to the United States by treaties with France in 1803 and with Spain in 1819. The only right ever conceded to the Indian was that of occupancy, which has generally proven to be the merest shadow of a right when it became inconvenient to the dominant race.

This question is fully reviewed by Chief Justice Marshall in Johnson v. McIntosh, 8 Wheat., where, upon page 585, it is said:

"It has never been doubted that either the United States or the several states had a clear title to all the lands within the boundary lines described in the treaty, [with Great Britain, 1783,] subject only to the Indians' right of occupancy, and that the exclusive power to extinguish that right was vested in that government, which might constitutionally exercise it."

And on page 587:

"The United States then have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold and assert in themselves the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indians' title of occupancy, either by purchase or conquest; and gave also a right to such a degree of sovereignty as the circumstances of the people would allow them to exercise. The power now possessed by the gov-

ernment of the United States to grant lands resided, while we were colonies, in the crown, or its grantees. The validity of the title given by either has never been questioned by our courts. It has been exercised uniformly over territory in possession of the Indians. The existence of this power must negative the existence of any right which may conflict with and control it."

The land in controversy having never, prior to its settlement in 1846, and, as we shall see, never prior to 1855, been within any government reservation, it would seem clear that the only title the Indians had to it was that of such occupancy as they had to unoccupied public lands in general, and that this right they held only by the voluntary consent of the government, which it might modify or extinguish, as it desired.

Attention has been called to the intercourse act of June 30, 1834, (4 Stat. 729,) defining the country west of the Mississippi river as "Indian Country." By section 11 it prohibits all white persons from settling upon "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe." It does not exclude other lands from such settlement, but, on the contrary, the reservation of certain lands from settlement would imply authority to occupy those not so reserved. Moreover, the act contemplates the residence of whites in the Indian country, for its chief object seems to be to so regulate their intercourse with the Indians as to prevent strife and disorder between the two races.

The two cases—U. S. v. Cook, 19 Wall. 591, and Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733—cited by defendant's counsel are concerning lands within Indian reservations, and cannot be considered controlling in this case. This right of general occupancy to the public domain is quite different from that given the Indians when a special reservation is by law or treaty assigned to them; this the government treats as something tangible, and of it they are never deprived until they relinquish their claim. All public lands, including any Indian title thereto, being under the control of the government, it must follow that any right which Craig may have obtained to the land must have been through the laws of the government, and any laws which granted him such right must at the same time have operated to extinguish the Indian title thereto. It remains, then, to inquire by what, if any, laws or authority Craig's settlement was made.

2. Prior to our treaty of June 15, 1846, with Great Britain, the territory of Oregon, including what now constitutes the states of Oregon, Washington, and Idaho, was, by treaties of 1818 and 1827 with Great Britain, "open and free to the citizens of both powers." While in this condition, the people of Oregon, in 1845, organized a provisional government, through which any resident of the territory was allowed a land claim of 640 acres. After our government obtained undisputed control of the country, it adopted, in 1848, a territorial organic act for Oregon, by which the land laws of the provisional government were revoked. By section 4 of the said donation act it was provided that "there shall be and hereby is granted" 640 acres of land to married persons who should comply with the

provisions of the act "so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon or since;" and by section 7, that "at any time after the expiration of four years from the date of such settlement, whether made under the laws of the late provisional government or not, shall prove," etc.

Thus congress recognized all rights which had accrued under the provisional government, but the grant was finally to pass to the settler only by a compliance with the conditions prescribed by the donation act.

3. Defendant interposes the objection that this act applied only to lands west of the Cascade mountains, hence not to those in question, which are east of that range.　　Section 3 provides for the survey only of the lands west of the Cascades; section 10 grants two townships therein for university purposes; section 7 of the amendatory act of February 14, 1853, (10 Stat. 158,) provides for appointment of land officers for the same territory; and by act of May 29, 1858, (11 Stat. 293,) it is directed that "the existing laws relating to the survey and disposal of the public lands in the territories of Oregon and Washington west of the Cascade mountains" are made applicable to the country east of those mountains.　　These provisions, considered alone, give some support to defendant's view, and possibly indicate that congress, by its last act, so construed its first. Considering, however, the whole act, it clearly appears as intended to apply to the entire territory.　　It is reasonable to conclude the survey was limited to the west, because most accessible.　　Neither was it needed then in the eastern part, which was little inhabited, while the purpose of the act of 1858 was to extend the surveys, not the act, to the entire territory.　　The donation act recognized the claims made under the provisional government, and there can be no pretense that they were limited to the western part of the territory.

In a contest over land lying east of the Cascades, in which the donation act was involved, no claim was made that the act was limited to the west thereof, (Missionary Society v. Dalles, 107 U. S. 336, 2 Sup. Ct. 672,) and so far as observed in the administration of the law it was treated by those enforcing it as applicable to the whole territory.　　It must be held applicable to the land in question.

4. What were the requirements of the donation act, and were they complied with by Craig?　　As required by section 4, he was a citizen of the United States.　　He and his wife were residents of the territory, and they "resided upon and cultivated the land for four consecutive years" immediately prior to June 4, 1855.　　By sections 6 and 7, certain notices were to be served by the settler upon certain officers, one within three and the other within twelve months after the survey of the lands, and "at any time after the expiration of four years from date of settlement shall prove by two disinterested witnesses the facts of continued residence and cultivation required by the fourth section of this act."　　By section 6 of the amendatory act of 1853 the notices were required "in advance of the time when the public survey shall be extended over the particular land claimed by" the settler, and the time in which to make

them was by another amendatory act of July 17, 1854, (10 Stat. 305,) extended to December 1, 1855. On June 4, 1855, Craig gave the notices required, and at the same time made the proof demanded by section 4 of the original act. By section 7, a certificate for patent should be issued at the time of making this proof, but it appears the register and receiver of the land office, who by law had succeeded the surveyor general, notified Craig of the receipt of his proof; that it was satisfactory, but that his certificate could not be issued until after the public survey, which was not made until 1870, prior to which Craig and his wife had conveyed their title and had died. At the time of this survey the purchaser from Craig had the land surveyed by the government surveyor, and paid him therefor. His subsequent application to the land department for his patent was refused, because—First, the proof was not accompanied by the affidavit required by section 12, to the effect that no sale of the land or contract of sale had been made; and, second, that no certificate, as required by section 7, had been issued. The affidavit required by section 12 (based also upon a provision of section 4) applied only to settlements made subsequent to December 1, 1850, and the provision of section 4 was repealed by section 2 of act of 1854. By Barney v. Dolph, 97 U. S. 652, it is held that the settler may, after having performed all the acts required, sell his claim.

From the foregoing it will be seen that by some means Craig had informed himself of the frequent changes in the law, and with which he complied in every particular except—First, his proof of residence and cultivation may have been premature; and, second, that he did not procure his certificate at the time of making his proof. Are these fatal defects? There is nothing in any of the acts that directly indicates that the proof should not be made prior to the survey. Its chief object is to show the settler's compliance with the law. Having done so, why should he not be permitted to show it, and thus, as far as he can, perfect his title? It cannot be seen how the government or others can be damaged by it. The government should have notice of any claim upon its lands, that other disposition may not be made of them. Had it been deferred until after the long-delayed survey, the settler might have been charged with laches. The land department did hold (Ex. B, Defts.' Ans.) that "the fact that William Craig filed his notice in 1855, and allowed the matter to rest until 1869, when he died, without making any attempt to perfect his claim under the donation act, is evidence that he intended to abandon his claim." It would be a good reason for delaying the proof until after the survey, had the act required that such claims must be taken by legal subdivisions, but by a fair construction of the acts the settler is not so limited. That the certificate was not issued cannot be charged to the neglect of Craig. He had complied fully with the law. His grantees have asked for the certificate and a patent, and the government has refused. I am unable to see what more the settler could or was required to do.

The question being in the condition shown by the foregoing statement, the government, on the 11th day of June, 1855, (12 Stat. 957,) entered into a treaty with the Nez Perce Indians, by which the

reservation, within the limits of which this land lies, was assigned to them.    Article 10 is as follows:

"The Nez Perce Indians having expressed in council a desire that William Craig should continue to live with them, he having uniformly shown himself their friend, it is further agreed that the tract of land now occupied by him and described in his notice to the register and receiver of the land office of the territory of Washington on the fourth day of June, last, shall not be considered a part of the reservation provided for in this treaty, except that it shall be subject in common with the lands of the reservation to the operations of the intercourse act."

This article was subsequently adopted and ratified by congress. It contained a notice to that body that Craig claimed the title, and not a mere right of occupancy, to these lands, under laws absolutely granting him such right by his compliance with their provisions, and the notice referred to in the treaty as filed in the land office with his proof, would show, not only his claim to the land, but also his compliance with the law. Although congress had such notice of the claim, and recognized Craig's rights to the land as claimed by him by excluding it from the reservation, it has since, by two acts, treated the claim of Craig as a mere right of occupancy.

By the treaty of June 9, 1863, (14 Stat. 647,) it was provided that the entire reservation, within which is this said land, was set apart to the Indians for their exclusive use, and that no white man should "be permitted to reside upon the reservation;" and by the act of March 3, 1873, (17 Stat. 627,) Craig's rights are expressly construed as a mere right of occupancy. That congress had the right to thus control the land, even to the cancellation of Craig's right and claim thereto, the cases of Frisbie v. Whitney, 9 Wall. 187, and the Yosemite Valley Case, 15 Wall. 77, are invoked. It was, in effect, held in those cases that under the pre-emption laws the settler's partial compliance therewith, and his manifested willingness to fully comply, did not give him such a vested right as estopped congress, prior to his full compliance, from making such other use or appropriation of the land as would operate to prevent him from procuring title.

Careful examination of the Yosemite Valley Case, where the question is fully reviewed, will show that the rule applicable to pre-emption cases will not hold in one like this. It proceeds upon the theory that under the pre-emption law, the government does not enter into any agreement to convey to the settler the land he locates upon until it shall have allowed him to complete his entry and claim by the payment of the government price for the land, and it also allows him the preference over others to buy the land when it shall be offered for sale, and that at any time prior to that the government may withdraw this privilege, and devote the land to any other use.    The court says, (page 87:)

"Until such payment and entry, the acts of congress give to the settler only a privilege of pre-emption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others. The United States by those acts enter into no contract with the settler, and incur no obligation to any one, that the land occupied by him shall even be put up for sale. They simply declare that, in case any of their lands are thrown open for sale, the privilege to purchase them in

limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use."

And upon page 94:

"It seems to us little less than absurd to say that a settler or any other person, by acquiring a right to be perferred in the purchase of property, provided a sale is made by the owner, thereby acquires a right to compel the owner to sell, or such an interest in the property as to deprive the owner of the power to control its disposition."

The court illustrates the differences between pre-emption cases and those under laws where the government does enter into a direct agreement to convey the title upon compliances with the prescribed precedent conditions, by a consideration of the case of Lytle v. Arkansas, 9 How. 314. This was under the act of May 29, 1830, (4 Stat. 420,) which, by its first section, provided "that every settler or occupant of public lands prior to the passage of this act, who is now in possession and cultivated any part thereof in the year 1829, shall be and he is hereby authorized to enter" the same upon making due proof of the pertinent facts. The settler had complied with the law as far as he could, but the land department refused him title, and the court said that "it is a well-established principle that when an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him," and proceeded to award the title to the settler as against the state claiming under a subsequent grant or act of congress; and in the Yosemite Valley Case, on page 91, the court says of the Lytle Case:

"There is no question about the correctness of the doctrine here announced. It is only a familiar principle which is stated,—that where one offers to do everything upon which the acquisition of a right depends, and is prevented by fault of the other side, his right shall not be lost by his failure. The principle only applies when, by law or contract, the acquisition of a right is made dependent upon the performance of certain specified acts. There can be no such thing as the acquisition of a right of pre-emption—that is, of a right to be preferred in the purchase of property of the United States—until such property is open for sale. In the case from Arkansas the law of 1830 authorized the entry and sale of the land to the occupants and cultivators. It prescribed certain things to be done to entitle them to purchase. These things were done, or would have been done if the officers of the government had not failed in their duty."

It is too evident for discussion that the different conclusions reached in the two cases are due solely to the different statutes upon which they rest. The earlier case is based upon a statute which gave the settler the absolute right to the title upon compliance with certain conditions, while by the statute involved in the later case no such right was granted.

The granting clause in the donation act, while not a grant in praesenti, borders closely on it. It reads: "There shall be and hereby is granted," etc., to every settler who shall comply with the act. If, under the law of 1830, the settler who complied therewith as far as permitted by the officers was entitled to his land even against a subsequent grant by the government, this court is justified

in the conclusion that it has reached,—that by Craig's compliance with the donation act, in so far as he was not forestalled by government officials, his right became a vested one, and thus passed beyond the control of congress.

The plat of the survey of the land made by the government surveyor did not correspond exactly with the description of it as given by Craig. I think it should be surveyed as described in the notices, but substantially as occupied and cultivated; and to the undivided one-half thereof complainant is entitled to retain the possession.

The defendant is the agent of the secretary of the interior. The power of the court to enjoin his agents has not been discussed. Generally the officers of the departments cannot be controlled by injunctions or mandamus while acting in a judicial capacity, in which their judgments are to be based upon a consideration of facts; but in this case the action of the land department involved a construction of law, which is not subject to the same rule. It is held in Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271, that such officers may be enjoined from the performance of an unlawful act. If the complainant is lawfully in the possession of the premises, it would be unlawful for defendant to forcibly eject him, and he may be restrained from so doing.

The injunction granted by the state court will be continued as prayed by complainant.

The court appreciates the baneful results that may follow this conclusion. It leaves a tract of land within the reservation subject to the occupation of white men, which is contrary to the wise policy of the government of excluding them as far as possible. Gladly would the court aid the Indian department in such exclusions, for there is nothing in the management of the Indians which results in so much annoyance as the residence among them of the whites, and especially of the lawless and abandoned; but, being convinced that the government, by its laws, authorized this settlement, and afterwards ratified it, my convictions are followed, regardless of consequences. The matter being important, I presume and hope it will be reviewed by a higher court. Therefore, in the absence of counsel, it is directed that defendant have time, until otherwise ordered, in which to file his bill of exceptions, or take any necessary steps for a review of the cause by the proper appellate court.