# SWIGART *v.* BAKER.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE
NINTH CIRCUIT.

No. 944. Argued April 9, 10, 1913.—Decided May 26, 1913.

A statutory provision for charging cost of construction of an improve-
ment against property benefited may include the cost of main-
tenance as well as of actual construction; and in determining the
scope of the provision the court may arrive at the legislative intent
by examining the history of the statute.

The history of the Reclamation Act of 1902 shows that it was the intent
of Congress that the cost of each irrigation project should be as-
sessed against the property benefited and that the assessments as
fast as collected should be paid back into the fund for use in sub-
sequent projects without diminution. This intent cannot be car-
ried out without charging the expense of maintenance during the
Government-held period as well as the cost of construction.

Subsequent legislative construction of a prior act may properly be
examined as an aid to its interpretation: and so *held* that statutes
passed since the Reclamation Act of 1902 indicate that Congress has
construed the provisions of that act as authorizing the Secretary of
the Interior to assess cost of maintenance as well as of construction
of irrigation projects upon the land benefited.

Where the executive officer charged with its enforcement annually re-
ports to Congress the same construction of a statute, it is significant
if Congress never has taken any adverse action in regard to such con-
struction.

*Quære* whether Congress may not by legislation construe a prior statute
so that as to all matters subsequently arising the action is legislative
in character.

The repeated and practical construction of the Reclamation Act of
1902 by both Congress and the Secretary of the Interior, in charging
cost of maintenance as well as construction, accords with the provi-
sions of the act taken in its entirety and is followed by this court.

199 Fed. Rep. 865, reversed.

THE facts, which involve the construction of the Rec-
lamation Act of 1902 and whether the purchaser was

required thereunder to pay the annual charges for maintaining the irrigation project by which his lands are irrigated, are stated in the opinion.

*Mr. Assistant Attorney General Knaebel*, with whom *Mr. S. W. Williams* and *Mr. W. W. Dyar* were on the brief, for appellant.

*Mr. W. T. Dovell* for appellee:

The unambiguous language of the act requires the charges for operation and maintenance to be paid out of the "Reclamation Fund" until such time as the major portion of the lands under a project shall have been paid for, when the management shall pass to the water users, and then to be maintained at their expense. The contention of the Government that the act is to be so construed as to permit the Secretary of the Interior to keep the "Reclamation Fund" intact without diminution on account of maintenance charges, and arbitrarily levy and collect by coercive measures of his own invention the charges of operation and maintenance, prior to the time when the major portion of the lands have been paid for as provided for in § 6 of the act, cannot be maintained.

In § 4 of the act, in directing how charges should be apportioned to the acreage under the ditch for the purpose of fixing the price at which water is to be sold, it is expressly provided that the charges shall be fixed so as to return to the fund the cost of construction. Nowhere is there a provision made for the return to the fund of any of the cost except the cost of construction. Had Congress intended that the fund should never be diminished by maintenance charges, here would have been an apt place to express such an intention.

Sections 5 and 6 also support appellee's contention. It is contemplated that during all this time the management and operation of the works shall remain, as they still are

in our case, with the officers of the Reclamation Depart-
ment; but when the time shall be reached that the major
portions of the lands under the ditch shall have been paid
for, the management and operation shall be taken over
by the water users themselves under some form of organ-
ization and under rules to be approved by the Secretary
of the Interior, and then the works shall be maintained
at the water users' expense.

This is the act as the law-making body saw fit to write
it. As it is clear in its meaning there is no function for
this tribunal to perform except to interpret it as written
and enforce the clearly expressed design of Congress. If
there be no ambiguity in the act, there is no room for
construction. *Hamilton* v. *Rathbone*, 175 U. S. 421;
*United States* v. *Goldenberg*, 168 U. S. 102; *Lake County*
v. *Rollins*, 130 U. S. 670.

The contemporaneous and practical construction which
the Interior Department has for some time placed upon
this act, and which appellant contends should be now fol-
lowed by the judicial department, is incorrect. The In-
terior Department has disobeyed the express mandate of
the law, and appellants now insist that the statute has
been in effect modified by this disobedience. Malfeas-
ance, however, cannot ripen into an amendment of the
law. Cooley Const. Lim., 7th ed., p. 105; *Houghton* v.
*Payne,* 194 U. S. 99; *United States* v. *Graham*, 110 U. S.
219; *United States* v. *Alger*, 152 U. S. 384; *Webster* v.
*Luther*, 163 U. S. 331; *St. Paul &c. Ry. Co.* v. *Phelps*, 137
U. S. 528; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S.
1; *Fairbank* v. *United States*, 181 U. S. 310; *United States*
v. *United Verde Copper Co.*, 196 U. S. 207.

As to interpretation by subsequent legislation, if any
words used in statutes passed subsequently thereto in-
dicate that Congress interpreted the "Reclamation Act"
as providing for the payment of maintenance and opera-
tion charges otherwise than out of the "Reclamation

Fund" prior to the time this period was reached, an all sufficient answer is if the subsequent Congress put such an interpretation upon the act it was and- is a wrong interpretation, as the words of the act itself indisputably demonstrate. See in this respect *Hamilton* v. *Rathbone*, 175 U. S. 419; *Koshkong* v. *Burton*, 104 U. S. 678; Sutherland on Stat. Constr.; and see 2 Lewis' Stat. Cons., 2d ed., § 447.

Appellants may not resort to the doctrine of construction by statutes *in pari materia*. This rule, like the other, has no application except where an actual ambiguity exists in the statute, and does not obtain where the intention of the law-making body has been clearly expressed. *Barnes* v. *Railroad*, 17 Wall. 307, *Lamp Chimney Co.* v. *Brass & Copper Co.*, 91 U. S. 662.

The well defined principle announced by all the courts and text writers is that prior or subsequent legislation may be resorted to to solve but never to create an ambiguity.

When a law making body designs to repeal or amend previous legislation, it has a well recognized method of doing so, so that the purpose cannot easily be mistaken, but no- attempt to amend this act in that way has ever been made by Congress.

While the Attorney General in 27 Op. Atty. Gen'l, 374, approved the practice of the Interior Department in assessing charges for maintenance and operation against the water users, under our form of government even one so high in official life as the Attorney General has not the power to change existing law. Courts do not yield their functions out of deference to the opinion of officers of other departments. *Deming* v. *M'Claughry*, 113 Fed. Rep. 639; aff'd 186 U. S. 49.

There is no presumption that Congress would require water users to pay the cost of maintenance. It was the policy of the American Government to recognize the

reclamation of arid lands as a public measure.  *United States* v. *Burley*, 179 Fed. Rep. 1.

The Government maintains lighthouses upon the coast, yet the suggestion has never been made that the support thereof should be paid for wholly by those who navigate the sea.

The reports of committee and debates in Congress make the purpose clear that the users shall not pay any charges until after the work is turned over to them, and that the cost of operation and maintenance of reservoirs and irrigation works shall be paid from the irrigation fund. See Cong. Rec., Vol. 35, pt. 3, p. 2276.

Reports of committees may be used as an aid to construction, where there is any ambiguity.  *Johnson* v. *Southern Pacific Ry. Co.*, 196 U. S. 20. See also Cong. Rec., Vol. 35, pt. 7, pp. 6683, 6753.

Where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived. *United States* v. *Fisher*, 2 Cr. 386.

While courts have said that resort is not to be had to the debates in legislative bodies to determine the construction of an act, courts do repeatedly resort to that very source for enlightenment.  *Wadsworth* v. *Boysen*, 148 Fed. Rep. 771; *Binns* v. *United States*, 194 U. S. 486; *Roberts* v. *Pac. Co.*, 186 Fed. Rep. 938; *Jennison* v. *Kirk*, 98 U. S. 453; *United States* v. *Wilson*, 58 Fed. Rep. 768; *Ex parte Farley*, 40 Fed. Rep. 66; *Simonds* v. *St. Louis &c.*, 192 Fed. Rep. 353.

MR. JUSTICE LAMAR delivered the opinion of the court.

The Sunnyside Unit of the Yakima Irrigation Project was so far completed in 1909 that the Secretary of the Interior gave notice that water would be furnished for irrigation purposes and that "the charges would be in

two parts: 1. Building of the irrigation system, $52 per acre . . . 2. For operation and maintenance, 95 cents per acre per annum." The appellee, Baker, applied for a water right and paid the assessed charges until 1911, when he refused to pay the 95 cents per acre for maintenance and operation, on the ground that the Secretary had no authority to make such an assessment. The Reclamation officers thereupon threatened to cut off the supply of water and Baker at once filed, in the United States Circuit Court for the Eastern District of Washington, a Bill against them, alleging that the charge for maintenance was illegal, that his crops, would be destroyed if water was not furnished and praying that the Reclamation officers should be perpetually enjoined from cutting off the supply of water because of his failure to pay the illegal assessment.

The defendants in their answer set up that the charge of 95 cents per acre, per annum, for maintenance and operation had been lawfully made by the Secretary of the Interior under the power conferred upon him by statute. The case was heard on Bill and Answer and the Bill dismissed. 196 Fed. Rep. 569. Baker took the case to the Circuit Court of Appeals, where, one judge dissenting, the decree was reversed (199 Fed. Rep. 865) on the ground that the Secretary of the Interior could not assess irrigable land with the cost of maintenance and operation.

Since its adoption in 1902 (32 Stat. 388, c. 1093) the act has always been differently construed by the Secretary of the Interior who, in granting water-rights, has uniformly assessed the landowners with the cost of maintenance. The contrary construction by the Circuit Court of Appeals raises a question of great importance to the owners of the land now irrigated. It is of equal importance to the Government and to that part of the public interested in the reclamation of those portions of the arid region which can be irrigated as soon as funds are available. For, by so much as the fund is depleted in the payment of

operating charges at one place, by so much is the reclama-
tion of arid lands elsewhere postponed.

The statute provides that the cost of construction of the
Project shall be charged against 'the land within the
irrigable limits. The phrase is not expressly defined and
being general in its terms is not necessarily limited to
building, but may include the preservation and main-
tenance of what has been built. For example, a statute
authorizing the levy of a tax to construct a sewer was
held to empower the city to levy taxes for its maintenance.
Power to construct a dock imposed the duty of operating
it. Permission to "construct internal improvements" war-
ranted the purchase of a plant already built, and authority
to construct a road conferred power to maintain it. *In re
Fowler,* 57 N. Y. 60; *Seymour* v. *Tacoma,* 6 Washington,
138; *Attorney General* v. *Boston,* 142 Massachusetts, 200;
*Pelham* v. *Woolsey,* 16 Fed. Rep. 418; *Atchison &c. Ry.* v.
*McConnell,* 25 Kansas, 370; *Bell* v. *Maish,* 137 Indiana,
226; *Weston* v. *Hancock County,* 98 Mississippi, 800, 54 So.
Rep. 307. So, in the present case the statute provides that
the Secretary may assess "the cost of construction of the
project" without defining the term, and it may assist in
arriving at the legislative intent to refer briefly to the
facts leading up to the passage of the Reclamation Act.

The official reports show that, in 1902, there were in
sixteen States and Territories 535,486,731 acres of public
land still held by the Government and subject to entry.
A large part of this land was arid, and it was estimated
that 35,000,000 acres could be profitably reclaimed by
the construction of irrigation works. The cost, however,
was so stupendous as to make it impossible for the de-
velopment to be undertaken by private enterprise, or, if
so, only at the added expense of interest and profit private
persons would naturally charge. With a view, therefore,
of making these arid lands available for agricultural
purposes by an expenditure of public money, it was pro

posed that the proceeds arising from the sale of all public lands in these sixteen States and Territories should constitute a Trust Fund to be set aside for use in the construction · of irrigation works—the cost of each Project to be assessed against the land irrigated, and as fast as the money was paid by the owners back into the Trust, it was again to be used for the construction of other works. Thus the fund, without diminution except for small and negligible sums not properly chargeable to any particular Project would be continually invested and reinvested in the reclamation of arid land. See H. R. Report, No. 1468, 57th Congress, 1st session.

The general outline of this plan was approved by Congress, which, on June 17, 1902, passed "An Act appropriating the receipts from the sale and disposal of public lands in certain States and Territories to the construction of irrigation works for the reclamation of arid lands." [1]  32 Stat. 388, c. 1093.

---

[1] The proceeds of the public land less certain deductions, were, sec. 1, "reserved, set aside, and appropriated as a special fund in the Treasury to be known as the 'Reclamation Fund,' to be used in the examination and survey for and the construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the said States and Territories, and for the payment of all other expenditures provided for in this Act."

Sec. 5.. The entryman upon lands to be irrigated by such works shall, in addition to compliance with the homestead laws, reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay to the Government the charges apportioned against such tract, as provided in section four. . . . The annual installments shall be paid to the receiver of the local land office of the district in which the land is situated, and a failure to make any two payments when due shall render the entry subject to cancellation, with the forfeiture of all rights under this Act, as well as of any moneys already paid thereon. All moneys received from the above sources shall be paid into the reclamation fund. . . .

The statute provided that the money arising from the sales of the public lands in these States and Territories was to be known as the Reclamation Fund and was to be used for the purpose of reclaiming arid lands. Provision was made for preliminary surveys, and when the Secretary determined that a Project was practicable, he was authorized to make contracts for its construction, if there were funds available. The land capable of being irrigated was to be open only to homestead entry and (sec. 4) the Secretary was then to give notice "of the charges which should be made per acre and the number of installments, not exceeding ten, in which the charges should be paid; these charges to be determined with a view of returning to the Reclamation Fund the estimated cost of the construction of the project . . . and all moneys received from the above sources shall be paid into the Reclamation Fund. . . . The Secretary of the Interior is hereby authorized and directed to use the reclamation funds for the operation and maintenance of all reservoirs and irrigation works constructed under the

Sec. 6. The Secretary of the Interior is hereby authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this Act: Provided, That when the payments required by this Act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior: Provided, That the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress.

Sec. 10. The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect."

provisions of this act; provided that when the payments required by this act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby to be maintained at their expense; . . . provided that the title to and management and operation of the reservoirs and works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress."

In pursuance of this act, various Works, including that of the Sunnyside Unit of the Yakima Project, were constructed and notice was given of the charges that would be made. At first they were stated in a lump sum, cost of building, maintenance and operation making up the total. After 1906, the charges were separately stated substantially thus: "1. For building, $—— per acre; 2. For maintenance and operation, $—— per acre per annum." [1]

1. The contention that this last item could not be assessed against the irrigated land is based upon the fact

---

[1] Examples of the form of Notice showing such division of charges, are to be found in "Report of Reclamation Service, 1908–1909," pp. 124, 130, 136, 163, 200. The Notice for the Sunnyside Project recites that water "will be furnished from the Sunnyside Project under the provisions of the Reclamation Act . . . and the charges which shall be made per acre of irrigable land which can be irrigated by the waters from said irrigation project are in two parts, as follows:

1. The building of the irrigation system, $52 per acre of irrigable land, payable in not more than 10 annual instalments. . . .

2. For operation and maintenance, which will as soon as the data are available, be fixed in proportion to the amount of water used, with the minimum charge per acre of irrigable land whether water is used or not. The operation and maintenance charge for the irrigation season of 1909, and until further notice, will be 95 cents per acre of irrigable land, for which water is ready in the irrigation season of 1909, whether water is used thereon or not.

that § 4 authorizes the Secretary to make the estimated
charges "with a view of repaying the cost of construc-
tion of the Project." But an analysis of the act shows
that the charges were not limited to the building of the
dam or the digging of the canals, but included the pur-
chase of land needed for reservoirs and everything charge-
able to "the cost of construction of the project," which
Project was later to be turned over as a going concern
to the landowners. The cost to the United States repre-
sented not only the expense of building but of mainte-
nance up to the time it was surrendered to the water
users. And as the Government collected no interest,
the result would be that if the cost of maintenance was
not returned there would be a constant and heavy diminu-
tion of the Reclamation Fund. That fund was the pro-
ceeds of public land and was not intended to be diminished
for the benefit of any one project, but, without increase
by interest and undiminished by local expenses, was
again to be used for constructing other works. The cost
of surveying those projects which were not developed
and the administrative expenses not chargeable to any
particular Project might not be repaid, but these sums
were so small as to be negligible as against the funda-
mental idea of the Bill, that the proceeds of public land
as a Trust Fund should be kept intact and again invested
and reinvested for constructing new irrigation works.
But if it should be taxed with cost of maintenance, it
follows as a mere matter of mathematics that the Reclama-
tion Fund would be greatly depleted if not entirely con-
sumed and the proceeds of the public domain be thus
diverted to the payment of local expenses.

2. If there could be any doubt as to the meaning of
the statute, it disappears in the light of congressional
construction which may properly be examined as an aid
in its interpretation. *Burridge* v. *Detroit*, 117 Michigan,
557. The Secretary of the Interior annually made re-

ports to Congress in which these charges of maintenance and operation were shown. No adverse action was taken as to these assessments by the Secretary. On the contrary, Congress in several instances showed that it construed the act in the same way. This distinctly appears in statutes providing a method by which irrigable lands in Indian reservations might be opened to entry and brought within the limits of an irrigation project. In these cases it was provided that the person taking up such land should pay the amount due to the Indians "*in addition to the charges for construction and maintenance of the irrigation system made payable into the reclamation fund by the provisions of the Reclamation Act.*" (Act March 6, 1906, 34 Stat. 53, c. 518, § 2.) A similar recital is found in the statute relating to the acquisition of irrigable land in the Blackfeet Reservation, where it was provided that if any such lands were "deemed practicable for an irrigation Project under the provisions of the Reclamation Act, said lands shall be disposed of under the provisions of said act and settlers shall pay, *in addition to the cost of construction and maintenance provided therein,* the appraised value of the Indian land." (March 1, 1907, 34 Stat. 1037, c. 2285.) See also 35 Stat. 85, c. 153; *Id.*, 558, 562, c. 237; 36 Stat. 835, c. 407.

3. It is argued that though these expressions show that Congress, in 1906 and 1907, thought that the cost of maintenance was chargeable under the Reclamation Act of 1902, yet no effect should be given to such legislative interpretation since Congress is not authorized to exercise the judicial function and has no power to construe existing statutes. But these acts of 1906 and 1907 were passed before the appellee, Baker, applied for his water-rights in 1909, and there are cases (*State* v. *Orphans' Home,* 37 Oh. St. 275; *Dequindre* v. *Williams,* 31 Indiana, 444), which would support a holding that this language, as to future transactions, was legislative in charac-

ter and incorporated these provisions into the original act. We refer to them, however, as we do to the notices given and charges made by the Secretary of the Interior, as showing the repeated and practical construction which has been given the statute from the beginning, and in the light of which many water-rights have been granted and many hundreds of thousands of dollars for maintenance paid to the Government as a part of "the cost of construction of the project." This practical interpretation by Congress and the Secretary of the Interior accords with the provisions of the act taken in its entirety.

The decree of the Circuit Court of Appeals is reversed, that of the District Court is affirmed and the case remanded to the District Court.

*Reversed.*