MASON et al. v. SAMS, Superintendent of Indian School, etc.

(District Court, W. D. Washington, S. D. April 9, 1925.)

No. 252.

1. Indians ☞3—Indians held to have exclusive fishing rights on reservation under Treaty.

Under the rule that treaties with the Indians are to be construed in favor of the Indians, the provision of the Treaty of 1855 with the Quinaielt or Taholah Indians that a tract of land to be selected should be "reserved, for the use and occupation of the tribes and bands aforesaid, * * * and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent," gives to the Indians an exclusive right of fishing on the reservation.

2. Indians ☞3—Department held, under treaty with Indians, without authority to make regulations with common right to fish.

Under Treaty of 1855 with Quinaielt or Taholah Indians, the right to fish is common to all members of the tribe, and the Secretary of the Interior or Commissioner of Indian Affairs is without authority to make regulations under which particular locations on Quinaielt river are assigned to individual members with exclusive rights therein, and requiring them to pay royalty on fish sold for the benefit of other members of the tribe.

In Equity. Suit by William Mason and others against W. B. Sams, personally and as Superintendent of the Quinaielt or Taholah Indian School Agency or Reservation. On motion to dismiss bill. Denied.

Stuart H. Elliott and H. G. & Dix H. Rowland, all of Tacoma, Wash., for plaintiffs.

Thos. P. Revelle, U. S. Atty., of Seattle, Wash., and Wallace W. Mount, Asst. U. S. Atty., of Tacoma, Wash., for defendant.

CUSHMAN, District Judge. The plaintiffs are members of the Quinaielt Tribe of Indians, residing on the Quinaielt Reservation, sometimes called the Taholah Reservation. They bring this suit to establish their right to fish in the Quinaielt river without payment of a royalty on the fish caught, and the right to sell their fish to whom they please. The bill prays that the superintendent of the Quinaielt agency be enjoined from enforcing regulations made by the Commissioner of Indian affairs, and the Secretary, requiring the payment of a royalty; and that he be enjoined from designating fish buyers to whom alone, under such regulations, plaintiffs would be allowed to sell their fish; and from enforcing all fishing regulations. The defendant moves to dismiss the bill for want of necessary parties.

The Quinaielt river rises in Quinaielt Lake, which lake forms part of the reservation boundary; the lake is fed by streams without the reservation. The Quinaielt river throughout its entire course, flows through the reservation, emptying into the Pacific Ocean. The regulations of which complaint is made were approved by the Assistant Secretary, December 13, 1924; they contain a recital of the purpose of their adoption:

"In order to provide for the conservation and preservation of the salmon supply of the Quinaielt river, and to allow a safe percentage of the fish to reach their spawning grounds in the Upper Quinaielt river and in Quinaielt Lake, and to protect them while spawning, all of which are necessary for the protection of the salmon fishing interests of the Quinaielt Tribe of Indians, the following rules are promulgated in lieu of the rules approved January 3, 1917, and April 9, 1919."

The regulations are applicable to all persons holding, claiming, or operating fishing locations on the Quinaielt river; they provide for fishing locations on both sides of the river, and the distance they are required to be apart. Provision is therein made for marking the channel of the river with stakes and buoys, which stakes are the outside stakes of the respective fishing locations. Fishing gear in the channel of the river, or in front of its mouth, is prohibited. The character and amount of fishing gear (cross-nets, leads and pockets) allowed on the reservation locations is prescribed. The operator of a fishing location, with certain exceptions, is required to fish it in person, and the assistance allowed him is restricted. In certain cases leases by the holder of a location are permitted for a period not exceeding one year. Reservation Indians, alone, are entitled to fishing locations. The assignment of a location is subject to cancellation by the Commissioner of Indian Affairs. Two or more Indians may be assigned one location, but only one allowed to operate at a time; no Indian is allowed to operate more than one location. Transfers of locations are under the exclusive control of the Commissioner. Failure to work a location in a proper manner subjects the location to transfer. Provision is made for a closed period each week. Nets must be lifted at least once in 24 hours. Fishing gear must bear the brand of the owner. Fishing in Lake Quinaielt is prohib-

ited except with hook and line, and that only in accordance with state law. The catching of salmon above the last set-net location approved by the office of Indian Affairs is prohibited at all times. Provision is made for closed ·seasons for all kinds of net fishing, except during certain hours two days each week for home consumption of the party fishing. The size of the mesh of the nets which may be used is prescribed. The regulations contain the following provisions:

"(21.) In the interest of the tribe to whom fishing rights on the Quinaielt Reservation belongs, and for the reason that only a comparatively small number of Indians can be assigned fishing locations, the following percentage of the fishing receipts shall be collected and placed to the credit of the tribe as a royalty. The funds so received to be used for the care of the aged and destitute members of the tribe when authorized by Congress, or for other general agency purposes. The royalties to be collected shall be as follows: All receipts up to $500 to be exempt from royalty. On receipts from $500 up to, and including $1,000, a royalty of 5 per cent. to go to the tribe. On receipts between $2,000 and $3,000, a royalty of 20 per cent. On receipts over $3,000, a royalty of 25 per cent.

"(22) To enable the superintendent to collect the royalties above proposed, all fishermen shall be required to sell their fish to licensed buyers, and each and every licensed buyer shall be required to furnish to the superintendent, at any time upon demand, a sworn statement setting forth the number of fish purchased from each fisherman. Each licensed buyer shall also withhold from the amount due to the fisherman for fish sold and delivered, a sum sufficient to meet the royalty provided for in paragraph 21 hereto, and shall pay over the same to the superintendent in charge of the Quinaielt Reservation on demand. Any violation of the conditions of this paragraph shall be deemed cause to suspend from fishing any fisherman who fails to deliver his fish to a licensed buyer and to suspend from buying any licensed trader who may fail to furnish the information demanded under oath, or who shall fail to withhold sufficient funds to pay the royalty as provided in paragraph 21, or who shall fail to pay over the same to the superintendent on demand. The rendition of a false report or statement as to the number of fish purchased from an Indian fisherman by a licensed buyer shall work an immediate forfeiture of the license of such buyer.

"(23) Violations of any of the foregoing rules shall, upon conviction therefor, be punished by withdrawal of fishing privileges as follows:

"(a) For the first such offense, the fishing privilege of the violator may be withdrawn for a period of not less than one week nor more than one month.

"(b) For the second offense, or for conviction for three or more violations at the same trial, all fishing privileges of the violator shall be withdrawn for not less than one month nor more than one season.

"(c) For the third offense, or for numerous flagrant violations, all fishing privileges of the violator shall be withdrawn for the remainder of the season and the fishing privileges of such holder at said location may be forfeited.

"(d) Where the circumstances justify such action, violations of the above regulations may also be punished by a fine for each offense in addition to the withdrawal of fishing privileges, as provided in sections A, B, and C. Failure to pay fines so assessed shall be deemed cause for ·withdrawal of fishing privileges within the discretion of the superintendent.

"(e) All gill-nets, set-nets, or other fishing appliances used or employed in the capture of salmon within the prohibited area, as herein set forth, shall be confiscated."

It is also provided that for a violation of the regulations, representatives of the Taholah (Quinaielt) Reservation, and of the Bureau of Fisheries, are authorized to arrest and prosecute accused persons before the court, of Indian offenses, subject to review by the superintendent of the reservation and the Commissioner of Indian Affairs. The superintendent is also authorized to commute sentences of a court, under certain conditions. The sole jurisdiction of the streams entering Lake Quinaielt, declared to be salmon spawning grounds, is recognized as being in the Bureau of Fisheries; joint jurisdiction by the officers of the reservation with the Bureau of Fisheries is asserted over the waters of the lake, and the Quinaielt river above the last set-net location.

[1] The bill is directed against the provisions of sections 21, 22, and 23 above quoted, providing for payment of a royalty on the fish caught and requiring sales of fish caught only to licensed buyers, and the penalties provided to insure the enforcement of this provision. These regulations are asserted to be a violation of the fishing rights granted by the Treaty of 1855 (12 Stat. at Large, 971). Articles II and III of this treaty provide:

"Art. II. There shall, however, be reserved for the use and occupation of the tribes and bands aforesaid, a tract or tracts of lands sufficient for their wants within the territory of Washington, to be selected by the President of the United States, and hereafter surveyed or located and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent. And the said tribes and bands agree to remove to and settle upon the same within one year after the ratification of this treaty, or sooner if the means are furnished them. In the meantime it shall be lawful for them to reside upon any lands not in the actual claim and occupation of citizens of the United States, and upon any lands claimed or occupied, if with the permission of the owner or claimant. If necessary for the public convenience, roads may be run through said reservation, on compensation being made for any damage sustained thereby.

"Art. III. The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands. Provided, however, that they shall not take shellfish from any beds staked or cultivated by citizens; and provided, also, that they shall alter all stallions not intended for breeding, and shall keep up and confine the stallions themselves."

The court has not had an opportunity to examine the wording of the executive order creating the reservation contemplated by the treaty, but it must be presumed that it did not restrict, in any respect, rights under the treaty.

It is observable that no exclusive right of taking fish upon the reservation, or in the streams running through it, or in the waters by which it is bounded, is expressly secured to the Indians by this treaty, as was done in the case of the treaty with the Yakimas. United States v. Winans, 198 U. S. 371–378, 25 S. Ct. 662, 49 L. Ed. 1089; Seufert Bros. Co. v. United States as Trustee, etc., 249 U. S. 194–196, 39 S. Ct. 203, 63 L. Ed. 555. It has been held that treaties with Indians are to be construed as "that unlettered people" understood them, and as justice and reason demand. Construction of treaties should favor the Indian. United States v. Winans, supra, at page 380, 25 S.

Ct. 662, 49 L. Ed. 1089; Seufert Bros. Co. v. United States as Trustee, etc., supra; Jones v. Meehan, 175 U. S. 1, 20 S. Ct. 1, 44 L. Ed. 49. Cherokee Intermarriage Cases: Red Bird et al., Citizens of the Cherokee Nation by Blood, v. United States; Fite et al., Intermarried White Persons, Claiming to be Entitled to Citizenship in the Cherokee Nation, v. United States; Persons Claiming Rights in the Cherokee Nation by Intermarriage v. United States, 203 U. S. 76, 89, 94, 27 S. Ct. 29, 51 L. Ed. 96.

Under this rule of interpretation the words of article II of the Quinaielt treaty: "Reserved for the use and occupation of the tribes and bands aforesaid * * * and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent"—should be construed as giving a like exclusive right of fishing upon the reservation to these Indians. Indeed, the regulations are, in part, made up of provisions which insure to them such exclusive privilege. One reason re-enforcing this conclusion is that the court takes judicial knowledge of the fact that at the time of making the treaty these Indians were particularly dependent for a living upon fishing—more so than were the Yakimas or any of the Plains Indians. That this was obvious to the framers of the treaty, and concededly so, may have been the reason that no express provision was made for exclusive fishing rights upon the reservation.

[2] The question for determination is whether, under the treaties and laws affecting Indians, Indian Tribes, and tribal rights, the Commissioner of Indian Affairs and Secretary are vested with a discretion in this matter. If they are so vested, they are necessary parties and the bill must be dismissed. Webster v. Fall, 45 S. Ct. 148, 69 L. Ed. ——; Gnerich et al. v. Rutter, 265 U. S. 388, 391, 393, 44 S. Ct. 635, 68 L. Ed. 1068; Warner Valley Stock Co. v. Smith, 165 U. S. 28, 33, 35, 17 S. Ct. 225, 41 L. Ed. 621. However, if the Commissioner and Secretary are not so vested with the authority exercised by them in promulgating these regulations, the motion to dismiss should be denied. Waite et al. v. Macy et al., 246 U. S. 606, 38 S. Ct. 395, 62 L. Ed. 892; Caldwell v. Robinson (C. C.) 59 F. 653, 660, affirmed Robinson v. Caldwell, 67 F. 392, 14 C. C. A. 448; Baker v. Swigart (D. C.) 196 F. 569–571, affirmed Swigart v. Baker, 229 U. S. 187, 33 S. Ct. 645, 57 L. Ed. 1143.

These Indian plaintiffs have been, by the

Act of June 2, 1924 (43 Stat. at Large, 1923–1924, part 1, page 253, c. 233), made citizens of the United States, with this proviso:

"That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property."

Under the rule favoring the Indians in the interpretation of treaties and laws affecting them, already alluded to, any fishing rights of plaintiffs under the treaty are preserved by this proviso.

By the Constitution, art. 1, § 8, cl. 3, Congress is given power to regulate commerce with the Indian tribes. Section 463, R. S. (Comp. Stat. § 716), makes it the duty of the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior and presidential regulations, to manage all Indian affairs and matters arising out of Indian relations. The allotting of the lands of a reservation in severalty while the title is still held by the United States for the Indians, and the conferring of citizenship upon them, does not extinguish the power conferred, nor the duty imposed, by these provisos. Heckman v. United States, 224 U. S. 413, 32 S. Ct. 424, 56 L. Ed. 820; United States v. Sandoval, 231 U. S. 28, 34 S. Ct. 1, 58 L. Ed. 107; United States v. Mullin (D. C.) 71 F. 682.

The legality of the regulations attacked by the bill depends upon the correctness of certain findings and conclusions recited therein. In section 21 of the regulations it is stated:

"In the interest of the tribe to whom the fishing rights on the Quinaielt Reservation belongs, and for the reason that only a comparatively small number of Indians can be assigned fishing locations, the following percentage of the fishing receipts shall be collected and placed to the credit of the tribe as a royalty. *   *   *"

It is plain that there are only a comparatively small number of fishing locations upon the river within the reservation, and that, broadly speaking, the fishing rights upon the river belong to the tribe; but there can be fishing in the river without granting exclusive rights to defined locations.

It does not follow, from the described conditions, that the individual Indian who wants to fish in that stream can be denied in order that, to his exclusion, fishing may be carried on for commercial purposes, in part, for the benefit of Indians of the tribe who do not care or who are not able to fish. The treaty was with the tribe; but the right of taking fish at all places within the reservation, and usual and accustomed grounds and stations outside the reservation, was plainly a right common to the members of the tribe—a right to a common is the right of an individual of the community.

Under articles II and III of this treaty the right to take fish was in the individual Indian—as much so as the right to pick berries, to gather roots, to hunt, or to pasture his ponies upon the open and unclaimed lands. The treaty can mean no less. Its language—and a common knowledge of the Indian's way of life—render it plain that the Indian must have understood by this treaty substantially as found by the court. Seufert Bros. Co. v. United States, as Trustee, etc., 249 U. S. 194, 197, 39 S. Ct. 203, 205 (63 L. Ed. 555):

"*   *   *   That neither claimed exclusive control of the fishing places on either side of the river or the necessary use of the river banks, but used both in common. One Indian witness, says the court, 'likened the river to a great table where all the Indians came to partake.' "

No intention is shown, nor implication warranted, that the Indian who fished should pay, from his fishing, the Indian who did not care to fish but chose, rather, to hunt, pick berries, gather roots, or run his ponies upon the public domain. It may be that in a case of tribal lands, or other property in excess of those required by individual members of the tribe, a different rule would obtain; but in the present suit it appears that part of the trouble is that there is not enough set-net locations to go around. The inconvenience arising from such a condition does not warrant a warped interpretation of the treaty. There are less arbitrary ways of meeting such a situation.

Clubs of limited membership have a waiting list; upon a crowded golf course, players await their turn; the whale belongs to the one whose harpoon first strikes him. There is no analogy in this matter between the power of the government, and the authority of the state over the fish in its streams. The state owns the fish and the game of the state, and may regulate or license the right to take them, or forbid it entirely. But the fish in the waters of this stream do not belong to the state, nor to the United States; but to the Indians of this reservation.

While particularly complaining of regulations 21 to 23, the bill attacks the regulations as a whole. From this it might be surmised that the plaintiffs were interested in set-net locations, designated under the regulations; but the bill discloses nothing of the

kind. Plaintiffs' rights have been herein considered solely under the treaty. If the plaintiffs are holders of set-net locations, or the Commissioner in designating such locations acted pursuant to any tribal agreement, questions other than those here considered would have to be taken into account.

Having reached this conclusion, it is not necessary to determine the Commissioner's authority, under other conditions, to license buyers; for it is plain, by the foregoing regulations, that the licensing of buyers is contemplated as a means of securing the payment of the royalties, the imposition of which and the designation of set-net locations, the court has held not warranted under the treaty.

The motion to dismiss is denied.