Charles F. KIMBALL, Stephen L. Lang, Allan Lang, Leonard O. Norris, Jr., James Kirk, and the Klamath Indian Game Commission, an agency of the Klamath Indian Tribe, Plaintiffs-Appellees,

v.

John D. CALLAHAN, Allan L. Kelly, Pat J. Metke, Frank A. Morre, and James W. Whittaker, each Individually, and as a member of the State Game Commission of the State of Oregon, John McKean, Individually, and as director of the Oregon Game Commission; and Holly Holcomb, Individually, and as director of the Oregon State Patrol and Oregon Game Enforcement Division, Defendants-Appellants.

No. 77–2628.

United States Court of Appeals, Ninth Circuit.

Jan. 26, 1979.

James H. Clarke (argued), of Dezendorf, Spears, Lubersky & Cambell, Portland, Or., for defendants-appellants.

Daniel H. Israel (argued), Boulder, Colo., for plaintiffs-appellees.

Before GOODWIN and ANDERSON, Circuit Judges, and JAMESON,* District Judge.

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

JAMESON, District Judge:

Appellants, the members and directors of the Oregon State Game Commission and the director of the Oregon State Patrol and Oregon Game Enforcement Division, have appealed from a judgment declaring that appellees, five Klamath Indians and the Klamath Indian Game Commission, and the members of the Klamath Indian Tribe are "entitled to the rights, privileges and immunities afforded under the Treaty of October 14, 1864, between the Klamath Indian Tribe and the United States to hunt, trap and fish within their ancestral Klamath Indian Reservation as it existed at the time of termination in 1954, free from Oregon State game and fish regulations"; and enjoining appellants from "asserting hunting, fishing and trapping regulations against members of the Klamath Indian Tribe while hunting, fishing, and trapping on the former Klamath Indian Reservation as it existed at the time of termination in 1954". The United States has filed an amicus brief in support of appellees.

## I. BACKGROUND

The treaty of October 14, 1864, 16 Stat. 707, which created the Klamath and Modoc Reservation, provided that the reservation "shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation . . ." The treaty secured for the Indians "the exclusive right of taking fish in the streams and lakes, included in said reservation . . . ." On a prior appeal this court interpreted this provision to include also the right to hunt and trap on the reservation. *Kimball v. Callahan*, 493 F.2d 564, 566 (9 Cir.) *cert. denied*, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974); (*Kimball I*). See also *Klamath and Modoc Tribes v. Maison*, 139 F.Supp. 634, 637 (D.Or.1956).

In 1954 Congress passed the Klamath Termination Act, which became fully effective in 1961. Act of August 13, 1954, 25 U.S.C. §§ 564–564x. The purpose of the Act was to terminate federal supervision over the trust and restricted property of the Klamath Tribe of Indians, to dispose of federally owned property acquired or withdrawn for the administration of the Indians' affairs, and to terminate federal services furnished the Indians because of their status as Indians. 25 U.S.C. § 564.

Pursuant to the Termination Act the tribal roll was closed on August 13, 1954. No child born thereafter was eligible for enrollment. 25 U.S.C. § 564b. Each person whose name appeared on the final roll had to elect either to withdraw from the tribe and receive the money value of his interest in tribal property or to remain in the tribe and participate in a nongovernmental tribal management plan. § 564d(a)(2). All tribal property was to be appraised and a sufficient amount of it sold to pay those members who elected to withdraw from the tribe and have their interest converted into money. § 564d(a)(3). Members who received the money value of their interests in tribal property "thereupon cease[d] to be members of the tribe . . . ." § 564e(c). The Act expressly provided, however, that nothing in the Act "shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty". § 564m(b).

In February, 1973, the appellees, five Klamath Indians who either personally withdrew or whose ancestors withdrew from the Tribe and had their interest in tribal property converted into money and paid to them, filed suit seeking a declaration of their right to hunt, trap and fish within their ancestral Klamath Indian Reservation free of Oregon fish and game regulation, pursuant to the Treaty of October 14, 1864. In a memorandum opinion dated March 15, 1973, the district court granted defendants' motion to dismiss for failure to state a claim. This court reversed. *Kimball v. Callahan, supra. (Kimball I).*[1] Relying on *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), we held that the

---

1. The district court also questioned whether it had jurisdiction under 42 U.S.C. § 1983 or 28 U.S.C. § 1331. This court found jurisdiction under § 1331.

plaintiffs who elected to withdraw from the Tribe pursuant to the Klamath Termination Act nevertheless retained treaty rights to hunt, fish, and trap, "free of state fish and game regulations on the lands constituting their ancestral Klamath Indian Reservation, including that land now constituting United States national forest land and that privately owned land on which hunting, trapping, or fishing is permitted". 493 F.2d at 569–70.

Following remand a supplemental complaint was filed in which the Klamath Indian Game Commission was joined as a plaintiff. In an opinion entered on September 10, 1976, the district court first recognized that this court in *Kimball I* found jurisdiction and "that the Indians' rights to hunt, fish and trap on their ancestral reservation are exclusive", and concluded that this court's holdings on these issues were the "law of the case". The district court held further (1) that the rights of Indians to fish, hunt, and trap, free of state regulations, extended to the descendants of persons on the final tribal roll; and (2) that the court had no authority to approve the plaintiffs-appellees' offer to permit state regulation under specified conditions for conservation purposes. The court did suggest that the defendants-appellants approve the Tribe's proposal or negotiate with representatives of the Klamath Indians in an effort to promulgate mutually satisfactory regulations.

Since the filing of the district court's opinion, the appellees have filed a motion for leave to file as an appendix to their brief their "Klamath Tribal Wildlife Management Plan," to which the district court referred in its opinion. Appellants oppose this motion.

## II. CONTENTIONS ON APPEAL

Appellants do not seek review of the jurisdiction issue; nor do they "seek reconsideration of the conclusion reached in *Kimball I* that rights of the Klamath Tribe under the treaty of 1864 survived the Klamath Termination Act". They argue, however, that the "law of the case" does not apply to the issues raised on this appeal. They contend that:

(1) Tribal rights can be exercised only by persons on the final tribal roll of August 13, 1954 who did not withdraw under the Klamath Termination Act, and withdrawn members cannot exercise hunting, fishing, and trapping rights under the 1864 treaty.

(2) Persons born after August 13, 1954 are not entitled to exercise hunting, fishing and trapping rights.

(3) Treaty rights cannot be exercised on land disposed of to the federal government and private purchasers.

(4) The State can "directly regulate the exercise of treaty rights by members of the Klamath Tribe for conservation purposes".

## III. RECONSIDERATION OF KIMBALL I

(a) *Law of the Case*

Preliminary to a consideration of the effect of specific holdings in *Kimball I*, we note that under the "law of the case" doctrine one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case. As the court stated in *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659, 662–63 (5 Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975):

This laudable and self-imposed restriction is grounded upon the sound public policy that litigation must come to an end. An appellate court cannot efficiently perform its duty to provide expeditious justice to all "if a question once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal".[2]

While the "law of the case" doctrine is not "an inexorable command", the prior decision of legal issues should be followed on a later appeal "unless the evidence on a subsequent trial was substantially different,

2. Citing *White v. Murtha*, 377 F.2d 428, 431 (5 Cir. 1967).

controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice". *White v. Murtha, supra,* 377 F.2d at 431–32.[3]

Appellants contend that *Kimball I* is inconsistent with two subsequent controlling decisions: this court's decision in *United States v. Washington,* 520 F.2d 676 (9 Cir. 1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), and the Supreme Court's decision in *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (*Puyallup III*). They also argue that evidence of the legislative history of 1958 amendments to the Klamath Termination Act which was not before this court on the prior appeal, shows Congress intended the Klamath Termination Act to terminate the treaty hunting, fishing, and trapping rights of those Indians who withdrew from the Tribe pursuant to the Termination Act. We cannot agree with either contention.

#### (b) *United States v. Washington*

In *Kimball I* the court held that a Klamath Indian possessing treaty rights to hunt, fish, and trap on the former reservation at the time of the Act's enactment retained those rights even though he relinquished his tribal membership pursuant to the Act. 493 F.2d at 569. Appellants argue that the basis of this holding was the court's conclusion that the Klamath treaty rights belonged to "individual Indians". This they contend, is inconsistent with this court's decision in *United States v. Washington, supra,*[4] as well as the Court of Claims' decision in *Whitefoot v. United States,* 293 F.2d 658, 155 Ct.Cl. 127 (1961), *cert. denied,* 369 U.S. 818, 82 S.Ct. 629, 7 L.Ed.2d 784 (1962),[5] that treaty rights are communal in nature and are owned by the Tribe, not by the members who exercise them. Neither of these cases, however, was concerned, as was *Kimball I,* with the tribal rights of individual Indians upon the termination of a tribe.

The court in *Kimball I* did not base its decision that withdrawn tribal members retained their treaty rights to hunt and fish upon any rights to tribal property. On the contrary, the court expressly recognized that withdrawn members relinquished all interests in tribal property. The court's decision was based on the express provision in the Termination Act that nothing in the Act "shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty". Moreover, the court's statement that treaty rights to hunt and fish are rights of the

---

**3.** See also *Otten v. Stonewall Ins. Co.,* 538 F.2d 210, 212–13 (8 Cir. 1976).

**4.** In *United States v. Washington,* the court was concerned with an apportionment by the district court of the opportunity to catch fish between treaty Indian tribes and others under treaties which gave the tribes the right to fish at all usual and accustomed grounds and stations, in common with all citizens of the Territory. The court rejected the State's argument that the Indian negotiators intended to secure for each member of the Tribe the right to compete for fish on equal terms *as an individual* with each individual settler. Because individual Indians had no individual title to property but participated in the communal rights of the Tribe, the court held that the "in common with" provision of the treaties entitled the treaty Indians to an opportunity to catch one-half of all the fish which, absent the fishing activities of other citizens, would pass their traditional fishing grounds. 520 F.2d at 688.

**5.** In *Whitefoot v. United States,* the United States built a dam across the Columbia River which inundated certain usual and accustomed fishing locations of the Yakima Nation. The plaintiffs, enrolled members of the Yakima Nation who used these sites, sued the United States for the taking of fishing rights which they claimed as their individual property. The court held that the use of accustomed fishing places reserved by the Yakimas by treaty was a tribal right for adjustment by the Tribe. The fact that certain Indians by tribal custom had been allowed to have sole use of a particular fishing spot gave that individual no property rights against either the Tribe or the United States. 293 F.2d at 663. Although we conclude *infra* that *Kimball I* is not inconsistent with *Whitefoot v. United States,* we note in passing that that case is not binding precedent upon this court.

individual Indian[6] must be understood within the context of the two cases cited in its support, *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 181, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and *Mason v. Sams*, 5 F.2d 255, 258 (W.D.Wash.1925).

In *McClanahan*, the State of Arizona attempted to impose its personal income tax on a reservation Indian whose entire income derived from reservation sources. In upholding the tax the Arizona court focused not on whether the tax infringed upon the appellant's rights as an individual Navajo Indian, but on whether the tax infringed upon the rights of the Navajo Tribe to be self-governing. *McClanahan v. Arizona State Tax Comm'n*, 14 Ariz.App. 452, 484 P.2d 221, 223 (1971). The United States Supreme Court rejected the notion that it was irrelevant whether the state income tax infringed upon appellant's rights as an individual Navajo Indian. Recognizing that when Congress has legislated on Indian matters, it has most often dealt with the tribes as collective entities, the Court reasoned that those entities were composed of individual Indians and the legislation conferred individual rights. The court held that appellant's rights as a reservation Indian were violated. 411 U.S. at 181, 93 S.Ct. 1257.

In *Mason* the district court considered whether in light of treaty provisions with the Quinaielt Tribe which the court construed as giving the Quinaielt Indians the exclusive right of fishing upon their reservation, the Commissioner of Indian Affairs could enforce regulations made by him without tribal consent which required the plaintiffs, members of the Quinaielt Tribe, to pay a royalty for the fish they caught in reservation streams to be used by the Tribe for the care of the aged and destitute members of the Tribe and for general agency

purposes. Because a limited number of fishing locations were available, not all tribal members were assigned fishing locations. Failure to sell fish to licensed buyers and to pay the royalty could result in imposition of a fine and withdrawal of fishing privileges for a whole season. Although the treaty giving exclusive fishing rights to the Quinaielts was with the Tribe, the court held that the right of taking fish was a right common to the members of the Tribe and that "a right to a common is the right of an individual of the community". 5 F.2d at 258.

 From *Mason* it is clear that an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member. See also F. Cohen, *Handbook of Federal Indian Law* 185 (1945). This was the basis for the court's statement in *Kimball I*. Prior to the Termination Act, the Klamath Tribe held treaty hunting, fishing, and trapping rights within its reservation in which the individual members of the Tribe held rights of user. The Termination Act did not affect those rights. That an individual member withdrew from the Tribe for purposes of the Termination Act did not change his relationship with the Tribe as to matters unaffected by the Act, e. g., treaty hunting, fishing, and trapping rights.[7] We find nothing in *United States v. Washington* and *Whitefoot v. United States* to the contrary.

### (c) *Puyallup III*

In *Kimball I* this court held that the appellees could exercise their treaty hunting, fishing, and trapping rights on former reservation lands which had been sold pursuant to the Termination Act.[8] Appellants contend this holding is inconsistent with the Supreme Court's subsequent decision in *Puyallup Tribe, Inc. v. Department of Game*,

---

6. 493 F.2d at 568–69, n. 9.

7. Congress recognized that local officials would have difficulty in later years identifying those who had hunting and fishing rights. Joint Hearings, Subcommittees of the Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 4, on S. 2745 and H.R. 7320, at 253–54.

8. The appellees (appellants in *Kimball I*) did not seek *exclusive* rights to hunt, fish, and trap on the transferred lands, nor did the court hold or intimate an opinion on the treaty rights of the Indians vis-a-vis private Oregon landowners. 493 F.2d at 569, n. 10, and 570, n. 11.

*supra* (*Puyallup III*), which they read as sustaining this court's decision in *Klamath and Modoc Tribes v. Maison*, 338 F.2d 620 (9 Cir. 1964), limiting the exercise of treaty hunting, fishing, and trapping rights to unsold lands on the reservation.[9] We do not find *Kimball I* inconsistent with *Puyallup III*.

In *Puyallup III* the Puyallup Tribe asserted an exclusive right to take steelhead fish which passed through its reservation. The State of Washington sought to regulate the Puyallup Indians' on-reservation exercise of their treaty fishing rights in the interest of conservation.[10] The Tribe argued that a treaty which provided that the Puyallup Reservation was to be "set apart, and, so far as necessary, surveyed and marked out for their exclusive use" and that no "white man [was to] be permitted to reside upon the same without permission of the tribe and the superintendent or agent,"[11] amounted to a reservation of a right to fish free of State interference on the Puyallup River. The Supreme Court found that such an interpretation clashed with the subsequent history of the reservation[12] and that neither the Tribe nor its members continued to hold the Puyallup River fishing grounds for their exclusive use. The tribal members' treaty right to fish "at all usual and accustomed grounds and stations," however, continued "to protect their right to fish on ceded lands within the confines of the reservation". 433 U.S. at 174, n. 13, 97 S.Ct. at 2622.

█ Because the treaty with the Klamaths did not contain a similar treaty provision, appellants argue that there is no basis for limiting state regulation of Indian hunting, fishing and trapping on the sold-off reservation lands to conservation measures. The Treaty of October 14, 1864, however, secured for the Indians "the exclusive right of taking fish in the streams and lakes in said reservation . . . ." The Klamath Termination Act expressly provided that nothing in the Act would abrogate the fishing rights secured by the treaty. As this court held in *Kimball I*, these two provisions protect the exercise of those treaty rights on the lands constituting the ancestral Klamath Indian Reservation. We find nothing contrary to this conclusion in *Puyallup III*. Both cases recognize that the transfer of reservation lands and modification of reservation boundaries may affect treaty rights by converting the exercise of those rights from exclusive to non-exclusive.[13] The Klamaths do not claim an *exclusive* right to hunt, fish and trap on the lands sold pursuant to the Termination Act. See *supra*, n. 8.

(d) *Legislative History of Termination Act and 1958 Amendment*

In 1958 Congress amended the 1954 Termination Act to prevent potential destruc-

---

**9.** In *Kimball I* the court stated that this holding in *Klamath and Modoc Tribes v. Maison* was incorrect in light of *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). 493 F.2d at 566, n. 4.

**10.** In *Puyallup Tribe v. Washington Game Department*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (*Puyallup I*), and *Washington Game Department v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (*Puyallup II*), the Supreme Court held that the State of Washington could regulate the Puyallup Indians' off-reservation exercise of their treaty fishing rights in the interest of conservation.

**11.** *Treaty of Medicine Creek*, 10 Stat. 1132, 1133 (1854).

**12.** Pursuant to two acts of Congress, the Puyallups had alienated all but 22 acres of their 18,000 acre reservation. None of the remaining 22 acres abutted on the Puyallup River, where tribal members fished and neither the Tribe 'nor its members continued to hold the Puyallup River fishing grounds for their exclusive use. 433 U.S. at 174, 97 S.Ct. 2622. The Supreme Court expressed no opinion on the continued existence of the Puyallup Reservation, a matter which had been in dispute. 433 U.S. at 173, n. 11, 97 S.Ct. 2621.

**13.** In *Puyallup III*, no exclusive fishing rights remained, (see *supra*, n. 12). In *Kimball I* the court recognized that exclusive hunting and fishing rights survived on that portion of the former Klamath Indian Reservation which was not transferred pursuant to the Termination Act, 493 F.2d at 569–70; but noted that appellants "do not seek exclusive rights . . . on land transferred pursuant to the Termination Act". *Id.* at 570, n. 11.

tion from over-harvesting of tribal forest lands which were to be sold to pay withdrawing tribal members the cash value of their interest in tribal property. Act of August 23, 1958, P.L. No. 85–731, 72 Stat. 816 (codified at 25 U.S.C. § 564w–1). The American Law Division of the Library of Congress submitted a report during the hearings on the bill which concluded that withdrawn tribal members would lose their treaty hunting and fishing rights and that reservations lands sold pursuant to the Termination Act would not be subject to the treaty rights of the Indians. Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 85th Cong., 2d Sess., Pt. 2, on S. 2047 and S. 3051, at 492–93 (Senate Hearings) (R. 587–88). In a letter to the Subcommittee chairman, the Acting Secretary of Interior took a similar position. Senate Hearings, at 397–98, 491–92 (R. 584–87; see also 62 I.D. 186, 202–03 (1955). Appellants claim this legislative history shows Congress did not intend that withdrawn tribal members should retain their treaty hunting, fishing, and trapping rights.

In concluding that withdrawn tribal members retained these rights, the court in *Kimball I* relied in part upon legislative history of the 1954 Termination Act. Recognizing that treaty obligations existed, Senator Watkins suggested that the Government "buy out" the Indians' hunting and fishing rights rather than preserve them after termination. The court found it telling that Congress did not heed this suggestion. *Kimball I*, 493 F.2d at 568–69, n. 9; see also Joint Hearings, Subcommittees of the Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 4, on S. 2745 and H.R. 7320, at 245–55.

■ Other portions of the legislative history of the 1958 amendments indicate that the Subcommittee members themselves were not certain what effect, if any, the Termination Act had upon the tribal treaty rights. Senate Hearings, at 397–98, 491–93 (R. 584–87). The Acting Secretary of Interior also recognized that different interpretations of its effect were possible, and ad-

vised Congress to clearly state its intentions. Letter to Hon. Richard L. Neuberger, Senate Hearings, at 491 (R. 586–87). Congress did not do so. The 1958 amendments to the Termination Act related solely to preservation of tribal lands as forests after their sale. If Congress intended the Termination Act to abrogate the Klamaths' treaty rights, it did not so indicate. As the Court recognized in *Menominee Tribe of Indians v. United States*, 391 U.S. at 413, 88 S.Ct. at 1711, " 'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress' ".

■ We conclude that the decision in *Kimball I* that withdrawn tribal members retained their treaty rights to hunt, fish, and trap on the lands constituting their ancestral Klamath Indian Reservation, including land constituting United States forest lands and privately owned land on which hunting, fishing and trapping is permitted, is the "law of the case".

## IV. EXERCISE OF TREATY RIGHTS BY DESCENDANTS

Appellants' contention that persons born after August 13, 1954, are not entitled to exercise treaty hunting, fishing, and trapping rights rests upon two points: (1) the Klamath Termination Act closed the tribal roll as of August 13, 1954 and expressly provided that children not alive on that date could not subsequently be included on that roll, 25 U.S.C. § 564b; and (2) to share in tribal property, a participant ordinarily has to have tribal membership status in his own right, not through his ancestors. This question was not decided by *Kimball I.*

■ Appellants' argument is based upon the premise that the tribal roll provided for by the Termination Act was final for purposes of determining who could exercise tribal treaty rights. We reject that premise. Although the Act terminated federal supervision over trust and restricted property of the Klamath Indians, disposed of federally owned property, and terminated federal services to the Indians, it specifically contemplated the continuing existence

of the Klamath Tribe. It did not affect the power of the Tribe to take any action under its constitution and bylaws consistent with the Act. § 564r. The Klamaths still maintain a tribal constitution and tribal government,[14] which among other things establishes criteria for membership in the Tribe.[15] The tribal roll created by the Act was for purposes of determining who should share in the resulting distribution of property. *Kimball I* held that the Act did not abrogate tribal treaty rights of hunting, fishing, and trapping. Neither did the Act affect the sovereign authority of the Tribe to regulate the exercise of those rights. The district court properly held that the Termination Act did not limit treaty hunting, fishing and trapping rights to persons on the 1957 final tribal roll, but that those rights also extended to the descendants of persons on the final roll.

## V. STATE REGULATION OF TREATY RIGHTS FOR CONSERVATION PURPOSES

In holding that off-reservation fishing may be regulated by the State for conservation purposes, the Court in *Puyallup I* said:

The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. . . But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate

against the Indians. 391 U.S. at 398, 88 S.Ct. at 1728.

In *Puyallup II* the Court held that the State of Washington's regulation barring net fishing of steelhead trout discriminated against the Indians and remanded the case for determination of a fair apportionment between Indian net fishing and non-Indian sports fishing. 414 U.S. at 48–49, 94 S.Ct. 330. In *Puyallup III* the Court found that the state court on remand from the decision in *Puyallup II*, had conducted a trial and from expert testimony and exhibits had applied a proper standard of conservation necessity and fashioned appropriate relief. 433 U.S. at 177, 97 S.Ct. 2616.

*Antoine v. Washington*, 420 U.S. 194, 207, 95 S.Ct. 944, 952, 43 L.Ed.2d 129 (1975), applied the rule set forth in *Puyallup I, supra*, with respect to land on a former Indian reservation which had been ceded to the Government. The Court said in part: "The 'appropriate standards' requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure [citing *Puyallup II* and *Tulee v. Washington*, 315 U.S. 681, 684, 62 S.Ct. 862, 86 L.Ed. 1115 (1942)], and that its application to the Indians is necessary in the interest of conservation."

The district court in its opinion noted that appellees "do not seek to exercise their treaty rights on land sold to private owners who prohibit hunting, fishing, and trapping on that land"; nor "do they seek to enforce exclusive rights on the remaining land, most of which is owned by the United States Government". The court referred to conditions under which appellees were will-

---

14. This is clear from Plaintiffs' Response To Defendants' Request For Production (R. 321) and Plaintiffs' Answers To Defendants Interrogatories (R. 336). Charles Kimball, one of the plaintiffs who withdrew from the Tribe pursuant to the Termination Act, is also a member of the Klamath Indian Game Commission. *Id.* at 342.

15. Although Congress has the ultimate authority to determine tribal membership, *Adams v. Morton*, 581 F.2d 1314, 1320 (9 Cir. 1978), petition for cert. filed, 47 L.W. 3423 (1978), we conclude that here it determined tribal mem-

bership only for purposes of distributing property pursuant to the Termination Act. Compare *Gritts v. Fisher*, 224 U.S. 640, 648, 32 S.Ct. 580, 56 L.Ed. 928 (1912), in which the Supreme Court held that Congress through its administrative control over the tribal property of tribal Indians had the power to reopen a tribal roll which it had closed by prior legislation, thereby making children born after the initial closing date eligible for receiving allotments and participating in the distribution of the remaining lands and funds of the Tribe.

ing to permit State regulation [16] and found that these conditions appeared "to conform with the current principles of State regulation of off-reservation fishing rights set forth in *United States v. Washington*, 520 F.2d 676 (9th Cir. 1975), and *Sohappy v. Smith*, 302 F.Supp. 899 (D.Or.1969)".

The court also noted that the General Council of the Klamath Tribe had recently approved comprehensive regulations for the hunting of game by Klamath Indians on the former Klamath Indian Reservation, which provided for joint regulation with State agencies. While it found their objectives commendable, the court concluded that it had no authority to judicially approve the proposals. The court expressed the hope that the Oregon Fish and Wildlife Commission would approve the proposals; or if the Commission were unable to approve all of them, that the Commission would meet with representatives of the Klamath Indians to promulgate mutually satisfactory regulations.

Appellees recognize that the State of Oregon has authority to reasonably regulate the exercise of their treaty hunting, fishing and trapping rights for conservation purposes.[17] The parties disagree with respect to (1) the scope of the State's authority and (2) whether this court should decide upon appropriate regulations or remand to the district court for its initial determination. Appellees contend that this court "should adopt limitations on state conservation authority which secures the right of Klamath Indians to exercise their treaty rights while

providing adequate protection for reservation wildlife". Both appellees and the United States as *amicus curiae* take the position that the extent of State regulation presents legal issues which can be resolved by this court on this appeal.

■ Appellants urge a remand to the district court for development of a factual record which would serve as a basis for establishing regulations within the scope of the State's right to regulate the Indians' treaty rights. We agree with the State that a factual record should be developed in the district court, as was done on remand in *Puyallup II*. In the event the parties are unable to agree upon mutually satisfactory regulations,[18] it will be necessary for the district court to determine the scope of the State's authority and formulate appropriate standards in the light of the evidence presented and the guidelines contained in *Puyallup I, II,* and *III, supra; Antoine v. Washington, supra; United States v. Washington, supra; Sohappy v. Smith, supra;* and *Settler v. Lameer*, 507 F.2d 231 (9 Cir. 1974).

## VI. CONCLUSION

We conclude that (1) *Kimball I* is the law of the case in its holding that members of the Klamath Tribe who withdrew pursuant to the Klamath Termination Act retain their treaty rights to hunt, fish, and trap on the former Klamath Reservation; (2) the treaty hunting, fishing, and trapping rights survived the Klamath Termination Act for all members on the final tribal roll and

---

**16.** The conditions as set forth in the district court's opinion read:

 1. The specific statute or regulation is required to prevent demonstrable harm to the actual conservation of the game or fish, *i. e.,* it is essential to the perpetuation of a particular species of game or fish.

 2. The measure is appropriate to its purpose.

 3. Klamath Indian tribal regulation for enforcement is inadequate to prevent demonstrable harm to the actual conservation of the game and fish.

 4. The conservation required cannot be achieved to the full extent necessary by restriction of hunting, fishing and trapping by non-treaty sportsmen.

**17.** Appellees stress the fact that they are not seeking exclusive rights to hunt, fish and trap on transferred land, stating that since "virtually all of the Indian lands of the former reservation have now been transferred there remains no exclusive hunting, fishing, and trapping on the Klamath Indian Reservation".

**18.** We do, however, urge the appropriate State officials, as did the district court, to meet with the representatives of the Klamath Indians in an effort to promulgate mutually satisfactory regulations for the management of the fish and game resources on the ancestral reservation lands.

their descendants; (3) the State of Oregon has authority, under appropriate standards to regulate treaty fishing, hunting and trapping rights on the former Klamath Indian Reservation for conservation purposes; and (4) in the event the parties are unable to agree upon mutually satisfactory regulations, the district court shall determine the scope of the State's authority in the light of the evidence presented and standards set forth in applicable cases.[19]

Affirmed in part, and remanded for further proceedings consistent with this opinion.

**19.** In view of our conclusion to remand for further proceedings, we see no reason to supplement the record by admitting the "Klamath Tribal Wildlife Management Plan".