

# The Attorney General of Texas

March 22, 1983

JIM MATTOX
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

1607 Main St., Suite 1400
Dallas, TX. 75201-4709
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1220 Dallas Ave., Suite 202
Houston, TX. 77002-6986
713/650-0666

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Mr. Charles D. Travis
Executive Director
Texas Parks and Wildlife Department
4200 Smith School Road
Austin, Texas    78744

Opinion No. JM-17

Re:  Enforcement of the Texas
Parks and Wildlife Code within
the confines of the Alabama-
Coushatta Indian Reservation

Dear Mr. Travis:

A question has arisen about the authority of the Texas Parks and Wildlife Department to enforce the Texas Parks and Wildlife Code within the confines of the Alabama-Coushatta Indian Reservation.  You have requested our opinion.

The "reservation" consists principally of two tracts located in Polk County.  One of them, consisting of 1,280 acres, was purchased in several parcels for the Alabama Indians by the state government in 1854 and 1855.  The purchase was authorized to honor a claim held by the Alabama tribe against the Republic of Texas.  Acts 1854, 5th Leg., ch. 44, at 68; Acts 1840, 4th Congress of the Republic, at 197.  See Attorney General Opinion WW-43 (1957); 1 Texas Indian Papers 102, 117; D. Jacobson, H. Martin, R. Marsh, Alabama-Coushatta Indians 288-89 (1974).  The other tract, an adjacent 3,071 acres, was conveyed in 1955 by the federal government to the state "in trust for the benefit of the Indians of the Alabama and Coushatta Tribes of Texas."  25 U.S.C. §721.  The transfer was accepted by Texas pursuant to earlier legislative authorization.  Senate Concurrent Resolution No. 31, Acts 1953, 53rd Leg., at 1078.  See Attorney General Opinions WW-468 (1958); WW-43 (1957).

·  The Texas Parks and Wildlife Code was enacted in 1975.  It establishes the Parks and Wildlife Department as an agency of the state, and charges it with administering the laws set out in the code and with enforcing all state laws relating to the protection and preservation of wild game, wild birds, fish and other marine life. Parks and Wild. Code §§11.011, 12.001, 12.101.·  Particularly, chapter 61 of title 5 of the code, which enacts the Uniform Wildlife Regulatory Act, provides that "[t]itle 7 of this code prescribes the counties, places, and wildlife resources to which this chapter applies."  Id. §61.003.  In addition, section 287.001 of title 7 reads:  "Except as provided in this chapter, the Uniform Wildlife Regulatory Act . . . applies to the wildlife resources in Polk

County." (Emphasis added). Thus, the Texas Parks and Wildlife Code is expressly applicable to wildlife resources on the Alabama-Coushatta Indian Reservation located in Polk County unless the code itself excepts the reservation from its operation, or unless some other law operates to do so. See In re Wilson, 634 P. 2d 363 (Cal. 1981).

Subchapter E, chapter 61 of the code makes special exceptions from portions of the Uniform Wildlife Regulatory Act for some areas and tracts in the state, but not for the Alabama-Coushatta Indian Reservation. In addition we have found no other Texas law that would exempt the reservation from code provisions applicable to Polk County generally, unless article 5421z, V.T.C.S., which purports to make the Texas Indian Commission responsible for "the development of the human and economic resources of the Alabama-Coushatta Indian Reservation" provides such an exemption. Id. §7. The authority of the Texas Indian Commission over reservation lands will be discussed in the course of considering a contention that no specific exemption is necessary to exempt reservation lands from the operation of the Parks and Wildlife Code because, it is argued, the peculiar status of the reservation as an Indian reservation removes it from the reach of the state's wildlife regulatory powers.

It is a general rule in the United States, of federal origin, that a state cannot enforce its game and fish laws within the domain of an Indian reservation situated within the borders of the state. See 41 Am. Jur. 2d Indians §19. Cf. Montana v. United States, 450 U.S. 544 (1981) (regulation of non-Indians). However, in Attorney General Opinion MW-49 (1979), this office observed that federal authority to enact legislation singling out tribal Indians for special treatment derives from the power of Congress to regulate commerce with Indian tribes, from the treaty power, and from the federal trusteeship over Indian lands established by the Indian Nonintercourse Act. See U.S. Const. art. I, §8, cl. 3; art. II, §2, cl. 2; 25 U.S.C. §177; Worchester v. Georgia, 31 U.S. 515 (1832). States do not share a similar "unique relationship" with Indians and may enact legislation singling them out only when authorized to do so by Congress. See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979); Foster v. Pryor, 189 U.S. 325 (1903). In passing, Attorney General Opinion MW-49 (1979) noted that the Alabama-Coushatta people have been specifically recognized by federal law, but it did not address the current status of those Indians under either Texas or federal law, or propose to settle any question with respect to them.

The current legal status of the Alabama and Coushatta Indians and of the Alabama-Coushatta reservation has been obscured and confused by past opinions of this office that sometimes were not consistent with the Texas Constitution nor with each other. The Texas Constitution adopted in 1876 makes no distinction -- and has never made one -- between Indians and other people, or between Indian peoples of different tribes. See Ex parte Flournoy, 312 S.W.2d 488, 491 (Tex.

1958); Missouri Pacific Railway Company v. Cullers, 17 S.W. 19, 21 (Tex. 1891). Until Congress made them United States citizens in 1924, Act of June 2, 1924, ch. 234, 43 Stat. 253, Indians were treated by Texas courts as resident aliens. Missouri Pacific Railway Company v. Cullers, supra. Since that time they have shared the rights and responsibilities of all Texans. See also 8 U.S.C. §1401(b); Attorney General Opinion V-664 (1948). Cf. Attorney General Opinion O-2802 (1940). Moreover, in 1972 a provision was added to the Texas Constitution prohibiting discrimination under the law on the basis of national origin. Tex. Const. art. I, §3a.

Some past Attorney General Opinions have regarded the Alabama-Coushatta people as "wards of the state," and have considered the state to be the "trustee" of all their land; some have not. In Attorney General Opinion V-664 (1948), the 1,280 acre tract was said to have been "conveyed to the Indians tax free and inalienable," but that statement was apparently based upon an article in the Southwestern Historical Quarterly, and not upon an independent examination of the appropriate deeds or the tax laws of the state. See Smither, The Alabama Indians of Texas, 36 Southwestern Historical Quarterly 83, 98 (1932). In Attorney General Opinion WW-43 (1957), it was declared that "[t]he Act of 1854 and the original deeds placed title to said land in the tribe of the Alabama Indians. . . . Such being the case, the State is not a trustee of the land, since it belongs to the Indians." (Emphasis added).

As stated earlier, the Alabama-Coushatta Indian Reservation consists principally of two tracts, one of them having been purchased in various units during 1854 and 1855, and the other having been deeded to the state much later by the federal government. Originally, the Alabama tribe and the Coushatta (or Coushatti) tribe were separate peoples. The 1854 grant of the 1,280 acres that constituted the original part of the reservation was made in the form of several deeds to "the tribe of Alabama Indians" or "that tribe of Indians known as the Alabama Indians." Some of the deeds alluded to the legislative purpose of the transaction but none expressly conveyed the lands to a "trustee" for the Indians or in any way restricted the future alienation of the lands conveyed. See D. Jacobson, H. Martin, R. Marsh, Alabama-Coushatta Indians 348 (1974). However, the act which authorized the purchase provided that:

> said Indians shall not alien, lease, rent, let, give or otherwise dispose of said land or any part thereof to any person whatsoever. And should the State of Texas hereafter provide a home for said tribe of Indians, and settle them thereon, then the said twelve hundred and eighty acres of land, with its improvements, shall become the property of the State.

Acts 1854, 5th Leg., ch. 44, at 68.

Although the Coushatta Indians came to join the Alabamas on the reservation in the interim, for many years following the 1854 purchase of the 1,280 acre tract the Indians and their land were not the subject of either judicial or legislative scrutiny.  It was not until 1928 that the federal government purchased the larger tract "in trust for the Alabama and Coushatta Indians of Texas."  See Act of May 29, 1928, ch. 853, 45 Stat. 883, 900; 88 Deed Records of Polk County Texas 209 (1928).  Furthermore, it was in the 1929 biennial appropriation bill for "state eleemosynary institutions" that the Texas legislature, for the first time following the adoption of the 1876 Constitution, appropriated money to the "Alabama and Coushatti Indians in Polk County, Texas."  Among the items of appropriations was one for "50 homes for inmates."  By rider the appropriations act specified that an agent (whose salary was to be paid one-half by the federal government) was to be appointed by and be under the control of the Board of Control.  Acts 1929, 41st Leg., 3rd C.S., ch. 17, at 457, 484-85.  In our opinion, these 1929 provisions were invalid.

Although an earlier legislative session had authorized the Board of Control to purchase all supplies used by "each eleemosynary institution. . . and all other State Schools or Departments of the State Government heretofore or hereafter created," Acts 1929, Forty-First Legislature, second Called Session, chapter 17, at 30, no general legislation had designated the Alabama-Coushatta lands as an eleemosynary institution in 1929.  Article III, section 44 of the constitution expressly prohibits (and prohibited then) the legislature from making any appropriation "when the same shall not have been provided for by pre-existing law."  Corsicana Cotton Mills, Inc. v. Sheppard, 71 S.W.2d 247, 250 (Tex. 1934).  At the very time the appropriation is made, there must already be in force some valid law rendering the claim to be paid a legal and valid obligation of the state; a "moral obligation" will not suffice.  Austin National Bank v. Sheppard, 71 S.W.2d 242, 245 (Tex. 1934).  The same section of the constitution also prohibits the legislature from employing of anyone in the name of the state unless authorized by pre-existing law.  Moreover, appropriation act riders, to be valid, must do no more than detail, limit, or otherwise restrict the use of funds appropriated.  Tex. Const. art. III, §35; Moore v. Sheppard, 192 S.W.2d 559 (Tex. 1946).  See Attorney General Opinion V-1254 (1951).

Nevertheless, from 1929 on, appropriations were regularly made to either the "Alabama and Coushatta Indians" or the "Alabama and Coushatta Indian Agency."  Later, in 1949, two relevant (but inadequate) general acts in pari materia were passed by the legislature; they dealt with "Texas State Hospitals and Special Schools."  The first, passed in April 1949, was an act designating the institutions previously called "Eleemosynary Institutions" as "Texas State Hospitals and Special Schools."  The title of the act did not refer to the Alabama-Coushatta tribe or its land, but the body of the law included the "Alabama-Coushatti Indian Agency" in the list to be thereafter known collectively as the "Texas State Hospitals and

Special Schools." Acts 1949, 51st Leg., ch. 157, at 324-25. The second act, finally passed in May of that year, was one, according to its title, "creating a Board for Texas State Hospitals and Special Schools" and "providing the transfer to said Board the control and management of hospitals and special schools." Again, the title omitted any reference to the Alabama-Coushatta and the land, but the body of the act specified that the term "Texas State Hospitals and Special Schools" shall mean, inter alia, "The Alabama Coushatti Indian Reservation, Livingston, Texas." Acts 1949, 51st Leg., ch. 316, at 588-89.

As will be later discussed, the 1949 acts, too, were ineffective to convert the lands into a state institution, in our opinion. Subsequently, however, three opinions, Attorney General Opinions WW-782 (1960); C-520 (1965) and C-593 (1966), relied upon the designation of the reservation as a "special school" under the jurisdiction of the Board for Texas State Hospitals and Special Schools or the Texas Commission for Indian Affairs, its successor, to determine the legal status of the reservation. The latter two opinions seemed to assume that the Texas Indian Commission, as successor to the earlier board, was charged with the control and management of the entire reservation and not merely land conveyed in trust to the state by the federal government. The same assumption was apparently made by Attorney General Opinion M-44 (1967).[1] The most recent opinion of this office relating specifically to the Alabama-Coushatta reservation did not address the question but did cite Attorney General Opinion C-520 (1965). See Letter Advisory No. 78 (1974). See also Attorney General Opinion O-7446 (1946).

Only the federally purchased land was involved in Attorney General Opinion WW-327 (1957), and the status of the 1,280 acres was not discussed. Attorney General Opinion WW-468 (1958), however, recognized that distinctions in legal status were to be made between the federally purchased and state purchased tracts, and said of the 1854 transaction, "to accurately determine the nature of the estate conveyed to the Indians, we must construe the deed and the Act together." It concluded that an oil and gas lease by the Indians on the 1,280 acres was prohibited by the 1854 legislative restriction against alienation but said, "[t]he reversionary estate is in the State of Texas and should the Legislature see fit to provide a lawful procedure for leasing these lands, it could do so." Thus, it appears that the removal of any legal restrictions upon alienation of the land by the Indians was thought by the author of WW-468 to depend upon a discretion lodged in the owner of the reversionary interest in the land, and not upon any trust relationship between the state and the tribe or its members, or upon any discretion that the state as a trustee might have in managing a trust for the benefit of the Indians.

---

1. The 1954 federal law "authorized" the tribe to convey the 1,280 acre tract to the state, but no such transfer was ever made insofar as we have determined; see 25 U.S.C. §721; Attorney General Opinion WW-43 (1957).

After a thorough review of all the applicable deeds, statutes, court opinions and Attorney General Opinions, we have concluded that in 1949 the Indians owned the 1,280 acres free of trust, and the rest of the land was held in trust for them by the United States, not by the state. No doubt with good intentions, but without the apparent consent of the Indians, the 1949 legislature purported to convert the tribal lands into an eleemosynary type institution and to vest control and management over them in the Board for Texas State Hospitals and Special Schools. Cf. Tex. Const. art. VII, §9 (asylums). Prior to these 1949 enactments, no general statute that we have found referred to the tribal lands as an eleemosynary institution or placed them under the control of a state agency, or even referred to them as a "reservation." Cf. Acts 1934, 43rd Leg., 2nd C.S., ch. 53, at 115 (creating Indian Village Independent School District). Indeed, one year earlier, in Attorney General Opinion V-664 (1948), it had been noted that "Indian Reservations" are areas which were reserved to Indians in treaties between the United States and the Indian tribes, and that the United States did not own any land in Texas to "reserve" for Indian tribes.[2] The opinion discussed the grants of state purchased and federally purchased lands, concluding:

> We are of the opinion that the Alabama and Coushatta Indians in Polk County are citizens of the United States and residents of the State of Texas. . . . We find nothing in the assistance given them by the State and Federal Government which renders them 'paupers' or otherwise disqualified to vote.

The state's ostensible assumption of power over the Indians' property was clearly in violation of article I, section 19 of the Texas Constitution, which specifies that no citizen of this state shall be deprived of "life, liberty, property, privileges or immunities, or in any manner disfranchised" except by due course of the law of the land. See Eggemeyer v. Eggemeyer, 554 S.W.2d 137, 140-41 (Tex. 1977). See also Tex. Const. art. I, §17 (taking, damaging or destroying property for public use). The Texas Constitution protected Indian citizens in their liberty and protected their property from confiscation, both in 1929 and thereafter.

"The Texas Indian Commission" is the name given in 1975 to the Commission for Indian Affairs, which in 1965 succeeded the Board for Texas State Hospitals and Special Schools with respect to the supervision, management, and control of the Alabama-Coushatta Indian Reservation. V.T.C.S. art. 5421z; Acts 1975, 64th Leg., ch. 185, at 435; Acts 1965, 59th Leg., ch. 279, at 552. Neither in 1965, 1949, or

---

2. Our use in this opinion of the popular designation "Alabama-Coushatta Indian Reservation" is for convenience only. Neither the 1,280 acre tract nor the 3,071 acre tract were ever part of the federal public domain, and federal statutes do not refer to the lands as an "Indian reservation."

1929 could the legislature by fiat make the Indians "wards of the state" or "inmates" of an eleemosynary institution, nor otherwise deprive them of their property or personal rights. The statutory attempts to unilaterally invest the Board of Control, and later the Board for Texas State Hospitals and Special Schools, with control and management of the 1,280 acre tract and associated assets were ineffective to legally accomplish that result. The 1965 act transferring the "powers, duties and functions" of the latter board to the new Commission for Indian Affairs (now the Texas Indian Commission) plainly accomplished no more, with respect to the title and control of that tract, than did the earlier acts. There may be valid subsequent transactions and covenants that affect the present use and disposition of the Indians' land, but there is no valid state law of which we are aware that would subject enforcement of the Parks and Wildlife Code on the 1,280 acre tract to any regulatory power of the Texas Indian Commission, nor one that would constitute the 1,280 acre tract an "Indian Reservation" within the meaning of federal law. See Attorney General Opinion MW-49 (1979). See also Organized Village of Kake v. Egan, 369 U.S. 60 (1962) (state power over non-reservation Indians).

We have not overlooked the terms of the 1854 law under which the original purchases were made. The conditional reverter and the restraints on alienation imposed by the 1854 act, assuming they should be read into the deeds to the 1,280 acres received by the Indians, have since been made nugatory by operation of law. It is no longer constitutionally permissible for the state of Texas to "provide a home for said Indians, and settle them thereon." Tex. Const. art. I, §3a. As a result, the grant has become absolute and not subject to defeasance. Davis v. Gray, 83 U.S. 203 (1873). Furthermore, perpetual disabling restraints on alienation are invalid under the present constitution. Tex. Const. art. I, §26. See Mattern v. Herzog, 367 S.W.2d 312 (Tex. 1963); Trustees of the Casa View Assembly of God Church v. Williams, 414 S.W.2d 697 (Tex. Civ. App. - Austin 1967, no writ). See also Gray v. Vandver, 623 S.W.2d 172 (Tex. App. - Beaumont 1981, no writ). Cf. Sonny Arnold, Inc. v. Sentry Savings Association, 633 S.W.2d 811 (Tex. 1982).

We turn now to the federally purchased tract of 3,071 acres. Neither the Alabamas nor the Coushattas have ever been signatories to a treaty with the federal government. When the early appropriation acts and the 1949 general statutes were passed, that tract was held in trust for the Indians not by the state of Texas, but by the United States, which had assumed a "unique relationship" with the tribe by statute, not by treaty. See Act of May 29, 1928, ch. 853, 45 Stat. 883, 900. The 1949 Texas legislation was obviously ineffective in itself to legally convert that federally held tract into an eleemosynary type institution controlled and managed by a state agency. The actual transfer of trust responsibilities from the United States to the state did not occur until 1955.

The "trust relationship" toward the Alabama-Coushatta that the federal government assumed in 1928 when it purchased the 3,071 acre tract for them was terminated by Congress in 1954. Section 726 of title 25, United States Code, provides, among other things:

> [A]ll statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the Alabama and Coushatta Tribes of Texas or the members thereof. . . and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

The effect of such "termination" was to destroy the "unique" status of the combined tribes and their members under federal law. Cf. United States v. Antelope, 430 U.S. 641, 647 n.7 (1977), citing with approval United States v. Heath, 509 F.2d 16 (9th Cir. 1974). See also Bryan v. Itasca County, 426 U.S. 373, 389 & n.15 (1976) (alluding specifically to the Alabama-Coushatta Tribes of Texas and their "termination" status). "Termination" is the last step in assimilation. Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma, 681 F.2d 705, 706 (10th Cir. 1982). See Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128 (1972) (effect of trust termination). Cf. Menominee Tribe of Indians v. United States, 391 U.S. 404 (1968) (treaty rights preserved by act in pari materia with termination act); Kimball v. Callahan, 590 F.2d 768 (9th Cir. 1979) (treaty rights expressly preserved by termination act itself); United States v. Felter, 546 F. Supp. 1002 (D. Utah, C.D., 1982) (mixed blood's tribal rights). The Supreme Court in Bryan v. Itasca County, supra, indicated that the congressional intent was to subject the Alabama-Coushatta "to the full sweep of state laws and state taxation." 426 U.S. at 389. Cf. United States v. John, 437 U.S. 634 (1978); Eastern Band of Cherokee Indians v. Lynch, 632 F.2d 373 (4th Cir. 1980) (tribes currently under federal supervision). At the same time, the federal corporate charter of the Alabama-Coushatta Tribes of Texas was revoked. 25 U.S.C. §725. As a consequence, apart from the rights of its members in the land previously mentioned, the "Alabama-Coushatta Tribes of Texas" is merely an unincorporated association under Texas law, with the same legal status as other private associations. See generally 7 Tex. Jur. 3rd Associations and Clubs §1 et seq. Cf. Attorney General Opinion MW-49 (1979).

The extent to which it was intended by the 1955 transfer to give control of the 3,071 acres to the state is somewhat in doubt. The legislative history of the act authorizing the transfer is found at [1954] U.S. Code Congressional and Administrative News 3119. There is some indication that the transfer was proposed mainly to allow state management of the timber resources of the tribe. Id. at 3121, 3122. In any event, the bill was amended, at the insistence of the Indians, to make any disposition of the lands by the state "subject to approval

of a majority of the adult members of the Alabama and Coushatta Tribes of Texas." Id. at 3129, 3130. See 25 U.S.C. §721.

The state did not step into the shoes of the federal government when it became trustee of the 3,071 acre tract, because it could not legally assume the same relationship toward the Indians that the United States occupied. As noted, prior to the transfer the United States purported to exercise its trusteeship in the context of its "unique relationship" with the tribe established by the Federal Constitution and the Indian Nonintercourse Act. See U.S. Const. art. I, §8, cl. 3; art. II, §2, cl. 2; 25 U.S.C. §177. On that basis, Congress could constitutionally provide the Indians special treatment rationally tied to its unique obligation toward them. Morton v. Mancari, 417 U.S. 535 (1974). As also noted, however, Indians occupy no status under state law that would authorize the state to single them out in a constitutionally offensive manner. Mere congressional permission to do so (as contrasted with a congressional mandate) is not enough if state law does not allow the state to exercise the permission granted. Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979). See Attorney General Opinion MW-49 (1979). The congressional language repudiates any suggestion that a federal preemption of state law was contemplated. The act effecting the transfer expressly specifies that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 25 U.S.C. §726. See Rehner v. Rice, 678 F.2d 1340, 1345 and n.11 (1982).

Under state law, the state of Texas or one of its agencies may hold and administer trust property in order to accomplish a proper public purpose, Friedman v. American Surety Company of New York, 151 S.W.2d 570 (Tex. 1941), but agents of the state cannot legally administer a trust or act as trustees if the agreement to do so is against public policy. Amalgamated Transit Union, Local Division 1338 v. Dallas Public Transit Board, 430 S.W.2d 107 (Tex. Civ. App. - Dallas 1968, writ ref'd n.r.e.), cert. denied, 396 U.S. 838 (1969). Therefore, in order for the state of Texas properly to hold and administer the trust accepted from the federal government, such acts must serve a proper public purpose under Texas law.

In 1955, when the United States transferred the land in trust to the state, the constitutional concept of equality under the law was undergoing change. It was still arguable then that classifications by a state on the basis of race or national origin were permissible if they were rationally predicated. Since that time it has become clear that such classifications can be justified only by a compelling state interest. Hunter v. Erickson, 393 U.S. 385 (1969). Cf. Shapiro v. Thompson, 394 U.S. 618 (1969). In 1972, Texas adopted an amendment to the state constitution reading:

> Equality under the law shall not be denied or
> abridged because of sex, race, color, creed, or
> national origin.   This   amendment   is
> self-operative.

Tex. Const. art. I, §3a.   Absent a compelling need, the state cannot discriminate either in favor of or against the Alabama-Coushatta people simply because they are "Indian."   See Mercer v. Board of Trustees, North Forest Independent School District, 538 S.W.2d 201 (Tex. Civ. App. - Houston [14th Dist.] 1976, writ ref'd n.r.e.).   Cf. Shaver v. Hunter, 626 S.W.2d 574 (Tex. App. - Amarillo 1981, writ ref'd n.r.e.); In re Baby Girl S, 628 S.W.2d 261 (Tex. App. - Eastland 1982, writ ref'd n.r.e.); Lincoln v. Mid-Cities Pee Wee Football Association, 576 S.W.2d 922 (Tex. Civ. App. - Fort Worth 1979, no writ); Vick v. Pioneer Oil Company, 569 S.W.2d 631 (Tex. Civ. App. - Amarillo 1978, no writ).

The evident purpose of all the state enactments since 1929 concerning the Alabama-Coushatta Indians has been to aid a small, needy ethnic group to which the state considered itself morally obligated, if not legally so.   Even if a rational basis for extending such aid might be postulated, it cannot be said that a compelling public purpose is served by singling out the Alabama-Coushatta people to be beneficiaries of a gratuitous trust relationship with the state.

A covenant or agreement that promotes racial discrimination cannot be enforced by state action.   Clifton v. Puente, 218 S.W.2d 272 (Tex. Civ. App. - San Antonio 1948, writ ref'd n.r.e.).   See also Shelley v. Kraemer, 334 U.S. 1 (1948); Harrison v. Tucker, 342 S.W.2d 383 (Tex. Civ. App. - Fort Worth 1961, writ ref'd n.r.e.).   The "trust" arrangement discriminates between the Alabama-Coushatta people and other citizens on the basis of their "Indian" origin.   Agents of the state, therefore, cannot control the 3,071 acre tract as trustees. Moreover, the deed from the federal government to the state conveying the land "in trust" does not prescribe the nature of the trust.   Under such circumstances, the trust is "dry" and the beneficiaries are entitled to the actual possession and enjoyment of the property.   The deed must be treated as vesting the title to the 3,071 acre tract in the Indians themselves.   Moore v. City of Waco, 20 S.W. 60, 63 (Tex. 1892).   See Bohn v. Bohn, 420 S.W.2d 165 (Tex. Civ. App. - Houston [1st Dist.] 1967, writ dism'd); 57 Tex. Jur. 2d Trusts §34.

In our opinion, the 3,071 acre tract is entirely free from any legally meaningful designation as an "Indian Reservation".   The 1929, 1949, 1965 and 1975 enactments of the Texas legislature were no more effective to constitute it an "Indian Reservation" than they were to so constitute the 1,280 acre tract.   See Attorney General Opinion MW-49 (1979).   It follows that to the extent the Texas Parks and Wildlife Department would otherwise be empowered to enforce provisions of the Texas Parks and Wildlife Code within the confines of the

"Alabama-Coushatta Indian Reservation" it is not precluded from doing so by virtue of a claim that it is an "Indian reservation." Parks and Wild. Code §287.001. To the extent that prior opinions of this office are inconsistent with the foregoing, they are overruled.

## SUMMARY

To the extent the Texas Parks and Wildlife Department would otherwise be empowered to enforce provisions of the Texas Parks and Wildlife Code within the confines of the "Alabama-Coushatta Indian Reservation," it is not precluded from doing so by virtue of a claim that it is an "Indian Reservation."

Very truly yours

JIM MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

Prepared by Bruce Youngblood
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Susan L. Garrison, Chairman
Jon Bible
Rick Gilpin
Eva Loutzenhiser
Jim Moellinger
Bruce Youngblood